IN THE CIRCUIT COURT IN AND FOR ESCAMBIA COUNTY, FLORIDA

DAVID B. FREEMAN,                    )
                                     )
        Plaintiff,                   )
                                     )
v.                                   )        Case No.: _____
                                     )
COMERICA BANK & TRUST, N.A.,         )
As Successor Trustee of              )
THE MCAULEY MARITAL TRUST            )
U/W DATED 3/24/2006,                 )
                                     )
        Defendant.                   )
                                     )
_____)

## COMPLAINT

COMES NOW Plaintiff David B. Freeman ("Plaintiff") and sues Defendant
Comerica Bank & Trust, N.A., as Successor Trustee of The McAuley Marital Trust U/W
dated 3/24/2006 ("Defendant"), and alleges:

### JURISDICTION AND VENUE

1.      This is an action for declaratory judgment and damages that exceed
$15,000.00, exclusive of interest, costs, and attorney's fees.

2.      Plaintiff is an individual domiciled in Baldwin County, Alabama.

3.      Michael Freeman McAuley ("McAuley") is a deceased individual born
June 11, 1938, and domiciled in Dallas (Harris County), Texas, at the time of his death in
2006.

4.      Upon information and belief, Defendant is a banking corporation with its
principal place of business in Harris County, Texas. Defendant is also Successor Trustee

of The McAuley Marital Trust U/W dated 3/24/2006 ("McAuley Trust"), a testamentary trust established by the Last Will and Testament of McAuley.

5.    Defendant operates, conducts, engages in, and carries on a business venture in the State of Florida.

6.    Defendant committed a tortious act within the State of Florida.

7.    Venue is proper in Escambia County, Florida, pursuant to section 47.051, Florida Statutes.

## FACTUAL BACKGROUND

8.    On or about August 31, 1981, Plaintiff, McAuley (Plaintiff's cousin), and one Patrick Duffy ("Duffy") formed the Perdido Key Joint Venture ("Joint Venture") to acquire and develop certain real property in Escambia County, Florida ("Joint Venture Property").

9.    Plaintiff's initial contribution to the Joint Venture consisted of ownership rights in the Joint Venture Property.  In exchange for this initial contribution, Plaintiff received 40% ownership of the Joint Venture.

10.    McAuley's and Duffy's initial contributions to the Joint Venture were contract rights to purchase the Joint Venture Property.  In exchange for their initial contributions, McAuley received 40% ownership of the Joint Venture and Duffy received 20% ownership of the Joint Venture.

11.    The original joint venture agreement was superseded in September 1981 by a First Revised Joint Venture Agreement ("1st JVA"), which provided for transfer of the property into another entity for development.

2

12.    Subsequent "venturers" provided the capitalization necessary to acquire the Joint Venture Property and said Property was in fact acquired.

13.    In 1983, the 1st JVA was amended to provide for an exchange of the Joint Venture Property for a condominium unit. *See* Second Revised Joint Venture Agreement ("2nd JVA"), a true and correct copy of which is attached hereto and incorporated herein as Exhibit "A."

14.    Pursuant to the terms of the 2nd JVA:

a.    The three initial venturers (Plaintiff, McAuley, and Duffy) collectively owned fifty percent (50%) of the Joint Venture, and the subsequent or "additional" venturers collectively owned fifty percent (50%) of the Joint Venture.

b.    The initial venturers' fifty percent (50%) was allocated in accordance with their original ownership percentages, such that Plaintiff and McAuley each owned twenty percent (20%) of the Joint Venture and Duffy owned ten percent (10%).

c.    All venturers had the exclusive right to occupy the Joint Venture Property for two (2) weeks each year.

d.    The managing venturers (Plaintiff, McAuley and Duffy) had day-to-day management, operation, and control of the Joint Venture.

e.    A venturer could not assign, sell, transfer, hypothecate, or otherwise dispose of his interest in the Joint Venture without the prior written consent of sixty percent (60%) in interest of the venturers.

15.    Within the 2nd JVA, the venturers expressly acknowledged and approved an assignment by Plaintiff of twenty-five percent (25%) of his interest (i.e., a 5% ownership interest in the Joint Venture) to one Robert Griffin.

3

16.    From the time the Joint Venture took possession of the condominium unit (henceforth, "Joint Venture Property"), Plaintiff and his wife managed the Joint Venture Property.

17.    McAuley handled scheduling of the venturers' respective "weeks" at the Joint Venture Property and the finances of the Joint Venture.

18.    In 1984, Plaintiff borrowed $6,500.00 from McAuley. Plaintiff issued a promissory note to McAuley to evidence the debt, but McAuley insisted that security for repayment of the debt was not needed. The parties did not discuss a timeframe for repayment of the debt.

19.    In January 1990, Plaintiff borrowed an additional $1,750.00 from McAuley (together with the 1984 loan, "Debt"). Again, McAuley declined security for the Debt and no timeframe for repayment was discussed.

20.    Plaintiff suggested that McAuley accept an assignment of his interest in the Joint Venture as security for the Debt, to preserve McAuley's priority of repayment as against any of Plaintiff's other creditors. At Plaintiff's insistence, McAuley instructed his lawyer to draft such an agreement.

21.    On or about January 31, 1990, McAuley presented to Plaintiff and Plaintiff signed an Assignment of Joint Venture Interest, which Plaintiff and McAuley understood to be an assignment as security for repayment of the Debt. *See* Assignment of Joint Venture Interest ("Assignment"), a true and correct copy of which is attached hereto and incorporated herein as Exhibit "B."

22.    Plaintiff and McAuley did not inform the other venturers of the Debt or the Assignment, which was a private matter between cousins.

4

23.    Following execution of the Assignment until McAuley's death, Plaintiff, McAuley, and the other venturers conducted business as usual with respect to the Joint Venture and the Joint Venture Property.

24.    Plaintiff and his wife continued to manage the Joint Venture Property and occupy the same during their allotted two weeks each year.

25.    Plaintiff's ownership of his interest in the Joint Venture was never challenged or questioned, and McAuley never demanded payment of the Debt.

26.    In September 1998, Hurricane Georges damaged the unit. Plaintiff, with the help of his wife, Alice ("Mrs. Freeman"), coordinated and managed the necessary remodeling as a managing venture of the Joint Venture.

27.    In September 2004, Hurricane Ivan nearly destroyed the Joint Venture Property. Plaintiff and Mrs. Freeman coordinated, managed, and physically participated in the remodeling, redecorating, and refurbishing of the Joint Venture Property.

28.    During the course of the four-year remodel, Plaintiff signed multiple contracts with engineers and other service providers as owner of the Joint Venture Property, with the blessing of the other venturers.

29.    Plaintiff and Mrs. Freeman committed countless hours and effort to the remodeling and rebuilding of the Joint Venture Property following the above-referenced storms without compensation for said time and/or effort.

30.    At all times during the various remodeling and rebuilding of the Joint Venture Property, Plaintiff and his wife were led to believe and did in fact believe that Plaintiff was part-owner of the Joint Venture.

31.    On or about June 5, 2006, McAuley died.

32.     Upon McAuley's death, Duffy assumed McAuley's management duties for the Joint Venture and the Joint Venture continued business as usual, with the exception that McAuley's widow assumed McAuley's right to occupy the Joint Venture Property for two (2) weeks each year.

33.     In 2008, Plaintiff was even sued as owner of the Joint Venture Property by a service provider to the Property.

34.     On or about January 12, 2009, Plaintiff received a letter from an attorney purporting to act on behalf of Frost National Bank ("Frost Bank") as Trustee of The McAuley Marital Trust U/W dated 3/24/2006 ("McAuley Trust"), which . *See* Letter dated January 12, 2009, from Jeffrey L. Fisher to David B. Freeman, III ("Termination Letter"), a true and correct copy of which is attached hereto and incorporated herein as Exhibit "C."

35.     In the Termination Letter, Frost Bank claimed that (1) Plaintiff had assigned all of his interest in the Joint Venture to McAuley under the Assignment, (2) said interest was owned by Frost Bank as Trustee of the McAuley Trust, and (3) the Joint Venture and the McAuley Trust asked that Frost Bank notify Plaintiff that, effective immediately, Plaintiff was no longer allowed access to the Joint Venture Property. The Termination Letter also asked Plaintiff to forward all keys to the Joint Venture Property.

36.     On or about February 4, 2009, Plaintiff's lawyer responded to the Termination Letter, (1) denying the McAuley Trust's interpretation of the intent of the Assignment, (2) affirming that both McAuley and his wife Becky acknowledged the true nature of the Assignment, and (3) asserting that the McAuley Trust was estopped from claiming otherwise. *See* Letter dated February 4, 2009, from Irvin Grodsky to Jeffrey L.

Fisher, a true and correct copy of which is attached hereto and incorporated herein as Exhibit "D."

37.     On or about February 16, 2009, Frost Bank answered Plaintiff's response, indicating that Becky McAuley had no recollection of such an arrangement and that the Assignment, by its terms, was not ambiguous. *See* Letter dated February 16, 2009, from Jeffrey L. Fisher to Irvin Grodsky, a true and correct copy of which is attached hereto and incorporated herein as Exhibit "E."

38.     On or about August 28, 2009, Plaintiff sent Frost Bank a letter concerning his denial of use of the Joint Venture Property, highlighting the inconsistencies between the McAuley Trust's interpretation of the Assignment and McAuley's behavior during his lifetime and offering to pay the Debt, plus interest, in exchange for cancellation of the Assignment and recognition of Plaintiff's ownership rights. *See* Letter dated August 28, 2009, from Irvin Grodsky to Jeffrey L. Fisher, a true and correct copy of which is attached hereto and incorporated herein as Exhibit "F."

39.     On or about September 14, 2009, Frost Bank responded to Plaintiff's letter on behalf of Becky McAuley, refusing to accept Plaintiff's offer without written documentation questioning the validity of the Assignment. *See* Letter dated September 14, 2009, from Mary Coane to Irvin Grodsky, a true and correct copy of which is attached hereto and incorporated herein as Exhibit "G."

40.     On or about August 17, 2011, Plaintiff sent Frost Bank a final letter demanding that it cease wrongfully interfering with Plaintiff's use and enjoyment of his interest in the Joint Venture, disclosing written documentation that the Assignment was legally invalid (including citation to legal authority) and re-asserting other contractual and

equitable defenses to the McAuley Trust's actions regarding the same. *See* Letter dated August 17, 2011, from J. Nixon Daniel, III to Jeffrey L. Fisher ("Demand Letter"), a true and correct copy of which is attached hereto and incorporated herein as Exhibit "H."

41.     On or about August 25, 2011, Defendant notified Plaintiff that Frost Bank had been removed as Trustee of the McAuley Trust and that Defendant was appointed Successor Trustee. Defendant stated that it was in possession of the Demand Letter and would review and respond to the same.

42.     On or about October 7, 2011, Defendant declined Plaintiff's final offer of settlement, as set forth in the Demand Letter.

43.     At all times following his receipt of the initial Termination Letter, Plaintiff acknowledged and offered to pay the Debt, as originally contemplated by the parties, upon the McAuley Trust's release of its claim to his interest in the Joint Venture.

## COUNT I – DECLARATORY JUDGMENT

44.     Plaintiff re-asserts paragraphs 2 through 43 as if fully set forth herein.

45.     This is an action for declaratory relief.

46.     There is a bona fide, actual, present practical need for a declaration as to the existence of any right(s) of Defendant to Plaintiff's interest in the Joint Venture under the Assignment.

47.     There is a bona fide, actual, present practical need for a declaration as to the validity of the Assignment upon which any such right(s) are founded.

48.     Said declarations deal with a present, ascertained state of facts or a present controversy as to a state of facts.

49.     Plaintiff's rights are dependent upon the law applicable to the facts.

50.     Defendant has an actual, present, adverse and antagonistic interest in the subject matter in fact and/or law.

51.     Defendant is before the Court by proper process.

52.     The relief sought is not merely the giving of legal advice by the Court or the answer to questions propounded from curiosity.

53.     The Assignment does not meet the requirements for a valid assignment of a venturer's interest in the Joint Venture under the 2nd JVA.

54.     Plaintiff and McAuley did not obtain the prior written consent of sixty percent (60%) in interest of the venturers prior to the alleged assignment.

55.     The Assignment is invalid as a matter of law.

56.     Plaintiff incurred costs in the bringing of this declaratory action.

WHEREFORE, Plaintiff demands declaratory judgment against Defendant that (1) the Assignment is an invalid assignment of Plaintiff's interest in the Joint Venture as a matter of law, and (2) Defendant's rights under the Assignment are limited to the rights of an unperfected secured creditor of Plaintiff.

COUNT II – CONVERSION

57.     Plaintiff re-asserts paragraphs 2 through 43 as if fully set forth herein.

58.     This is an action for damages in excess of the minimum jurisdictional limits of this Court.

59.     At all times material hereto, Plaintiff owned a 15% interest in the Joint Venture.

60.   Defendant unlawfully, wrongfully, and without authorization assumed and exercised dominion and control over Plaintiff's interest to the detriment and exclusion of, and inconsistent with, Plaintiff's rights as the owner thereof.

61.   Plaintiff has suffered damages as a result of Defendant's wrongful and illegal conduct.

WHEREFORE, Plaintiff demands judgment against Defendant for compensatory and punitive damages.

## COUNT III - CIVIL THEFT

62.   Plaintiff re-asserts paragraphs 2 through 43 as if fully set forth herein.

63.   This is an action for civil theft brought pursuant to Chapter 772, Florida Statutes.

64.   Defendant knowingly obtained and used Plaintiff's property with intent to deprive Plaintiff of his right to the property and the benefit of the property.

65.   Defendant knowingly obtained Plaintiff's property with intent to appropriate Plaintiff's property to the use of a person not entitled to the use of the property.

66.   Plaintiff suffered damages as result of Defendant's theft.

67.   Pursuant to Fla. Stat. § 772.11(1), Defendant is liable to Plaintiff for treble the actual damages caused by Defendant's theft.

68.   Pursuant to Fla. Stat. § 772.11(1), Plaintiff is entitled to recover reasonable court costs and attorney's fees from Defendant.

WHEREFORE, Plaintiff demands judgment against Defendant for treble damages and reasonable court costs and attorney's fees.

mistake, Defendant should be estopped from denying that the Assignment was intended to be a pledge of Plaintiff's interest in the Joint Venture to secure repayment of the Debt.

80. McAuley actively represented to Plaintiff, both before and after execution of the Assignment, that the Assignment was a pledge of Plaintiff's interest in the Joint Venture as security for repayment of the Debt.

81. Plaintiff relied on McAuley's representations in good faith.

82. As a result of said representations and reliance thereon, Plaintiff detrimentally incurred excessive obligations and expenses related to the Joint Venture Property that he would not have incurred otherwise.

83. Defendant, McAuley's successor in interest, now asserts that the Assignment was a complete and unconditional assignment of Plaintiff's interest in the Joint Venture in satisfaction of the Debt.

84. It would be highly inequitable and unjust to deny Plaintiff's right to his interest in the Joint Venture.

WHEREFORE, if the Court determines that the Assignment is not invalid as a matter of law and that the Assignment is not due to be reformed on the basis of mutual mistake, Plaintiff demands that Defendant be estopped from asserting that the Assignment was not a pledge of Plaintiff's interest in the Joint Venture to secure repayment of the Debt.

## COUNT V – UNJUST ENRICHMENT

85. Plaintiff re-asserts paragraphs 2 through 43 as if fully set forth herein.

86. This is an action for damages in excess of the minimum jurisdictional limits of this Court.

87.   Alternatively, if the Court determines that the Assignment is not invalid as a matter of law, that the Assignment is not due to be reformed on the basis of mutual mistake, and that the Defendant is not estopped from denying that the Assignment was a pledge of Plaintiff's interest in the Joint Venture to secure repayment of the Debt, Defendant has been unjustly enriched by the Assignment.

88.   Plaintiff conferred a benefit on McAuley by assigning his interest in the Joint Venture to McAuley in satisfaction of the Debt.

89.   McAuley knew that the value of Plaintiff's interest in the Joint Venture grossly exceed the amount of the Debt.

90.   McAuley accepted the benefit conferred by Plaintiff and Defendant retained said benefit.

91.   The circumstances are such that it would be inequitable for Defendant to retain the benefit conferred by Plaintiff without paying fair value for it.

92.   Defendant owes Plaintiff damages in the amount by which Defendant has been unjustly enriched, together with interest from March 24, 2009.

WHEREFORE, if the Court determines that the Assignment is not invalid as a matter of law, that the Assignment is not due to be reformed on the basis of mutual mistake, and that the Defendant is not estopped from denying that the Assignment was a pledge of Plaintiff's interest in the Joint Venture to secure repayment of the Debt, Plaintiff demands damages against Defendant based on its unjust enrichment.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury on all issues so triable.

J. Nixon Daniel, III
Fla. Bar. No. 228761
**Jodi Daniel Cooke**
Florida Bar No.: 52651
BEGGS & LANE, RLLP
501 Commendencia Street
Pensacola, Florida 32502
(850) 432-2451 (telephone)
(850) 469-3331 (facsimile)

*Attorneys for Plaintiff*

PERDIDO KEY JOINT VENTURE

SECOND REVISED JOINT VENTURE AGREEMENT

This Revised Joint Venture Agreement (the "Agreement") is made and entered into as of the _____ day of _____, 1983 by and among each of the persons whose names and places of residences are set forth in Exhibit "A" attached hereto (collectively the "Venturers" and individually a "Venturer") and is a revision to the First Revised Joint Venture Agreement (the "First Revised Joint Venture Agreement") dated the _____ day of September, 1981, which was a revision to the original joint venture agreement (the "Original Joint Venture Agreement") dated the last day of August, 1981.

W I T N E S S E T H :

WHEREAS, Mike McAuley ("McAuley"), J. Patrick Duffy ("Duffy") and David B. Freeman, III ("Freeman") (the "Initial Venturers") have contributed to this Joint Venture (the "Joint Venture") the rights to purchase approximately two (2) acres of land (the "Property"), fronting 211 feet on the Gulf of Mexico and 125.73 feet on Gulf Beach Highway, situated on Perdido Key in the County of Escambia, State of Florida, which is more particulary described in Exhibit "B"; and

WHEREAS, the persons who are listed on Exhibit A have provided the capitalization necessary for the acquisition of the Property and the Property has been acquired; and

WHEREAS, the First Revised Joint Venture Agreement provided for the transfer of the Property into another entity for development which the Venturers no longer desire to occur; and

WHEREAS, the Venturers desire to provide for an exchange ("Exchange") of the Property for that certain condominium unit (the "Condominium") more particularly described in Exhibit "D";

NOW, THEREFORE, for and in consideration of the mutual covenants herein contained, the Venturers hereby amend the First Revised Joint Venture Agreement for the purposes and upon the terms, provisions and conditions hereinafter set forth.

ARTICLE I

FORMATION; NAME AND OFFICE; PURPOSE AND POWERS; ACQUISITION OF THE PROPERTY

Section 1.1 Formation. The Joint Venture was formed on the last day of August, 1981 with the signing of the Original Joint Venture Agreement under the laws of State of Texas pursuant to the provisions of the Uniform Partnership Act for the purpose and upon the terms and conditions therein set forth and was modified and superseded by the First Revised Joint Venture Agreement which is modified and superseded by this Agreement.

Section 1.2 Name and Office. The name of the Joint Venture is Perdido Key Joint Venture, but may operate and conduct its affairs under any name or names deemed appropriate by the Venturers. The principal place of business in Texas shall be 2001 Bryan Tower, 30th Floor, Dallas, Texas 75201, or such other place as the Venturers may from time to time designate. The Managing Venturers (as defined in Section 4.3) may establish places of business of the Joint Venture when and where required by the Joint Venture business.

EXHIBIT

A

Section 1.3 **Purpose**. The character of the business of the Joint Venture shall be to acquire, own, option, lease, operate, improve and hold the Condominium for the personal use of the Venturers as well as an investment in order to realize income from rentals as well as from the future appreciation thereof by resale. The Joint Venture shall have the power to (i) Exchange the Property for the Condominium pursuant to that certain Agreement attached hereto as Exhibit "D" (the "Condominium Agreement"); (ii) refinance the Condominium; (iii) utilize the proceeds from refinancing of the Condominium to satisfy the furnishing obligations set forth in the Condominium Agreement; (iv) pay Twenty-One Thousand Dollars ($21,000.00) to Freeman for his efforts in effectuating the Exchange; (v) develop and dispose of the Condominium, or any interest therein, as well as to acquire other assets useful or necessary to the Joint Venture in conducting the business of acquiring, developing and disposing of the Condominium; (vi) file and prosecute any and all necessary or appropriate applications or petitions to governmental authorities, in connection with the use of the Condominium; (vii) sell and/or lease all or any part of the Condominium, at such times and on such terms and conditions as the Managing Venturers may determine in accordance with the Agreement; and (viii) in general, engage in all activities and take all actions necessary or appropriate to accomplish the purposes of the Joint Venture. This Agreement, however, shall be deemed and construed to create a joint venture for the sole purpose of carrying out the activities and accomplishing the purposes described in this Article I.

Section 1.4 **Exchange of the Property**. The closing date for the Exchange of the Property for the Condominium is to occur on or before January 10, 1984.

Section 1.5 **Term**. The term of the Joint Venture commenced upon the signing of the Original Joint Venture Agreement and shall continue until all assets and properties of the Joint Venture are sold or otherwise disposed of and all proceeds from such disposition shall have been distributed to the Venturers entitled thereto, or until December 31, 2030 on which date the Joint Venture shall dissolve, unless sooner dissolved in accordance with the Uniform Act upon the occurrence of any of the events of dissolution, as described in Article VIII.

## ARTICLE II

## INTERESTS OF THE VENTURERS

The Venturers shall be those persons named under the caption "Venturers" on Exhibit "A" and shall have interests in the Joint Venture in the percentages set forth opposite their respective names in Exhibit "A", all as the same may be changed from time to time in accordance with the provisions of this Agreement and, except as provided herein, no other person shall become a Venturer or substitute Venturer in the Joint Venture. The term "interest" as used herein shall mean the interest of the Venturer in the Joint Venture, including his share of the obligations of the Joint Venture, gains or losses from the sale of Joint Venture assets, and profits or losses of the Joint Venture.

## ARTICLE III

## CAPITAL CONTRIBUTIONS; DEFAULTS

Section 3.1 **Initial Contribution**. All initial capital contributions shall be required of each Venturer in accordance with the schedule attached hereto as Exhibit "A".

Section 3.2 **Future Contributions**.

(a) The Additional Venturers (who are hereby defined as all Venturers other than the Initial Venturers) shall contribute from time to time such additional capital to the Venture as may be required to fund the monthly debt service of the Venture, to pay regular and special assessments relating to the Condominium from

SECOND REVISED JOINT VENTURE AGREEMENT - Page 2

any condominium associations, to pay maintenance expenses, to pay insurance and taxes and to pay all other expenses incurred in carrying out the purpose of the Venture. The amount of such additional capital contributions and the time for their payment shall be determined by the Venture Managers in their good faith discretion. The Venture Managers shall provide notice to the Additional Venturers of the amount of such additional capital contributions at least thirty (30) days before they are due. The additional capital contributions of each Additional Venturer shall be equal to his share (determined by reference to Exhibit "A") of the interests of all Additional Venturers.

(b) Except as provided in Section 3.2(a) no Additional Venturer shall have any further obligation to make additional capital contributions (or to obtain such credit to obtain such funds), unless (i) a majority in interest of the Additional Venturers have determined that such additional capital contributions are required, and (ii) notice is given to the Additional Venturers at the address in Section 10.1 of this Agreement of a call for additional contributions in a specified aggregate amount. In which case, each Additional Venturer shall (within thirty (30) days after notice of such call is received) make an additional cash contribution equal to his share (determined by reference to Exhibit "A") of the interests of all Additional Venturers.

Section 3.3   <u>Failure to Make Additional Capital Contributions or Other Default.</u>  In the event any Additional Venturer fails to make additional capital contributions in accordance with the provisions of Section 3.2, the other Venturers may, but shall not be obligated to, make such capital contributions on their own behalf and on behalf of the defaulting Venturer in the amount of the defaulted capital contribution. The defaulting Additional Venturer shall repay to such other Additional Venturers all sums advanced by such Venturer on behalf of the defaulting Additional Venturer on or before thirty (30) days following the date the advance is made, plus interest at the rate of fifteen percent (15%) per annum. In the event that any Additional Venturer shall at any time default in his obligations under the provisions of this Section 3.3, and such default shall continue for a period of thirty (30) days after the receipt of written notice from the Managing Venturers to the defaulting Additional Venturer, or in the event any Venturer is determined to be in substantial default of this Agreement as set forth in Section 6.8, such defaulting Venturer shall lose all rights with respect to the Joint Venture. In addition to the foregoing, the Managing Venturers shall, in addition to the other rights conferred on the Joint Venture hereunder, have the right to designate a substitute Venturer, which may include any Venturer or his Affiliates (Affiliates means any (a) Venturer, (b) member of the immediate family of any Venturer, (c) legal representative of any Venturer, (d) trustee for the benefit of any Venturer, (e) corporation, joint venture, partnership or other business entity of which a majority of the voting interest is owned by any one or more of the Venturers) who shall have the right to purchase the defaulting Venturer's interest in the Joint Venture for Ten Dollars ($10.00) and the assumption by such designee of the defaulting Venturer's unpaid payments. Each Venturer hereby grants the Managing Venturers, or any of them, with full power of substitution, an irrevocable, special power of attorney, coupled with an interest, which shall survive the death, incompetency or legal disability of such Venturer, to take all actions necessary to transfer the Interests of such Venturer in the Joint Venture to such substitute Venturer as shall acquire his interest in the Joint Venture as provided in this Section should such Venturer default in the payment of his capital contribution.

Section 3.4   <u>Security Interest.</u>  Each Venturer hereby grants to the Venture a security interest in his interest in the Venture to secure the performance of such Venturer's obligations under this Agreement. In the event that any Venturer shall fail to perform any of its obligations hereunder, the Venture Managers may, at their option do any one or more of the following: (i) foreclose the lien created hereby through court proceedings, (ii) enforce any and all rights and remedies the Venture may

have under the Uniform Commercial Code of the State of Texas to enforce its rights under the security interest herein granted, and/or (iii) take any other action and exercise any and all other rights and remedies which the Venture may have at law or in equity. Notwithstanding any foreclosure, such defaulting Venturer shall remain liable for any deficiency remaining after such foreclosure. Each Venturer hereby agrees to execute and deliver such documents and instruments to evidence the existence of such security interest as the Managing Venturers shall request.

Section 3.5   Loans to the Joint Venture by Venturers.   Any Venturer may make loans to the Joint Venture in such amounts, on such terms, and for such purposes as may be from time to time approved by a majority in interest of the Venturers. By execution of this Agreement each Venturer consents to the loan by McAuley of Five Thousand Dollars ($5,000.00) to the Joint Venture evidenced by that certain Promissory Note attached hereto as "E", and the repayment of such loan as set forth in such Promissory Note.

Section 3.6   Return or Withdrawal of Capital Contributions; Distributions; Loans.

(a)   Except as provided in Article V or as otherwise expressly provided in this Agreement, none of the Venturers shall be entitled to demand a refund or return of any capital contributions nor to withdraw any part of his capital account nor to receive any distribution from the Joint Venture.

(b)   The amount of any loan made to the Joint Venture by a Venturer shall not be considered an increase in such Venturer's capital contribution or otherwise a contribution to the Joint Venture nor shall the making of such loan entitle such Venturer to an increased share of the profits or losses or distributions to be made pursuant to the provisions of this Agreement or, except as otherwise expressly provided in this Agreement, to any interest on such loan.

Section 3.7   Capital Accounts.   A capital account shall be established for each Venturer and shall be credited with the amounts of his cash capital contributions and shall be credited or charged, as the case may be, with his distributive share of Joint Venture profits or losses and gains or losses resulting from the sale of Joint Venture assets. Distributions to Venturers shall be charged against their respective capital accounts. Credits and charges to capital accounts of the Venturers shall be in accordance with this Agreement.

## ARTICLE IV

## MANAGING VENTURERS

Section 4.1

(a)   The Managing Venturers shall have the day-to-day management, operation and control of the business and affairs of the Joint Venture. Any decision of the Managing Venturers under the terms of this Agreement shall require the concurrence of only two (2) of the Managing Venturers.

(b)   Without limiting Section 4.1(a) and subject to the authority of a majority in interest of the Additional Venturers, to limit or amend the following powers: the Managing Venturers shall have the power to (i) exchange the Property for the Condominium pursuant to that certain Agreement attached hereto as Exhibit "D" (the "Condominium Agreement"); (ii) refinance the Condominium; (iii) utilize the proceeds from refinancing of the Condominium to satisfy the furnishing obligations set forth in the Condominium Agreement; (iv) pay Twenty-One Thousand Dollars ($21,000.00) to Freeman for his efforts in effectuating the Exchange; (v) manage the Condominium; (vi) execute such documents as they may deem advisable for Joint Venture purposes; (vii) subject to Section 4.2,

SECOND REVISED JOINT VENTURE AGREEMENT - Page 4

sell, transfer, assign, convey, lease, sublet, mortgage or otherwise dispose of or deal with all or any part of the Condominium on such terms as they deem reasonable; (viii) accept, retain, and transfer legal title to the Condominium in the Venturers' names, as Trustee, for the benefit of the Joint Venture (ix) acquire and maintain insurance for the Condominium; (x) attempt to rent or cause the Condominium to be rented for weeks not personally being used by a Venturer; (xi) perform or cause to be performed the Joint Venture's obligations, and exercise or cause to be exercised all of the Joint Venture's rights, under any agreement to which the Joint Venture or any nominee of the Joint Venture is a party including, but not limited to, the Condominium Agreement; and (xii) to perform all other duties and actions required of the Managing Venturers by this Agreement.

(c) The Managing Venturers may, on behalf of the Joint Venture, employ, engage, retain or deal with any person to act in such other capacities as the Managing Venturer may determine, including, without limitation, the hiring of any person to perform services in connection with the operation, management, service, leasing, advertising and sale of the Property, provided that in all such cases services are deemed by the Managing Venturers to be advisable and the compensation therefor is reasonable, and provided, further, that the Managing Venturers shall continue to be primarily responsible for the fulfillment of all of their obligations pursuant to this Agreement. The Joint Venture shall reimburse the Managing Venturers for all direct out-of-pocket expenses incurred on behalf of the Joint Venture in accordance herewith. The fact that the Managing Venturers are employed by, or are directly or indirectly connected with, any such person or that it is otherwise an Affiliate shall not prohibit the Managing Venturers from employing or otherwise dealing with such person.

(d) In connection with any refinancing or new financing of any mortgage on the Condominium, the Managing Venturers are specifically authorized, in their sole discretion, to appoint any Affiliate of any Venturer to act as the broker, exclusive or non-exclusive, for the Joint Venture.

(e) The Managing Venturers are authorized on behalf of the Joint Venture to execute any contract, note or mortgage, deed of trust or any modification thereof in connection with the Exchange or the refinancing of the Condominium and to execute any required security agreements with respect to tangible or personal property or other property owned by the Joint Venture, and any other documents which may be required in connection with such Exchange or refinancing, or any modifications thereof, or any documents which may be required at the closings thereof or in connection with the closing of mortgage loans providing financing ore refinancing for the Condominium, including, without limitation, easements, cross-easements, reservations, rights-of-way or other encumbrances on all or portions of the property pertaining to the Condominium in order to satisfy the lending institution or institutions which grant mortgage financing for the Condominium, all without the requirement that all the Venturers, or any of them, consent thereto.

(f) During the continuation of the Joint Venture, the Managing Venturers or any other Venturer may acquire, promote, develop, operate and manage real property on his or their own behalf or on behalf of any Affiliates thereof. The Managing Venturers and any Affiliates, may, notwithstanding the existence of this Agreement, engage in any activities they choose, whether the same are competitive with the Joint Venture or otherwise, without having or incurring any obligation to offer any interest in such activities to the Joint Venture or any party hereto. Neither this Agreement nor any activity undertaken pursuant hereto shall prevent the Managing Venturers or any Affiliates thereof from engaging in such activities, or require such Managing Venturers to

permit the Joint Venture or any other Venturer to participate in such activities, and, as a material part of the consideration for the Managing Venturers' execution hereof, each Venturer hereby waives, relinquishes and renounces any such right or claim of participation.

(g) The Managing Venturers are authorized to expend Joint Venture funds, in their management capacity, as are necessary to carry out the purposes of the Venture.

Section 4.2  Restrictions.  Notwithstanding the provisions of Section 4.1 above and except as elsewhere otherwise expressly provided in this Agreement, subsequent to the Exchange (and financing thereof) the Managing Venturers agree not to sell, transfer, assign, convey or otherwise dispose of all or substantially all of the assets of the Joint Venture without the written consent of a majority in interest of the Additional Venturers. Further, the authority and power granted pursuant to section 4.1 may be limited, amended or revoked by action of a majority in interest of the Additional Venturers. Each Venturer by execution of this Agreement consents to the Exchange pursuant to the terms of the Condominium Agreement.

Section 4.3  Appointment, Replacement, and Compensation of the Managing Venturer.

(a) McAuley, Duffy and Freeman shall be and are hereby appointed the Managing Venturers of the Joint Venture. In the event any person ceases to act as the Managing Venturer, or his appointment as Managing Venturer is terminated by agreement of eighty percent (80%) in interest of the Additional Venturers, the Venturers shall appoint a successor Managing Venturer by a vote of a majority in interest of the Venturers;

(b) The Managing Venturers shall be obligated to perform without consideration except as otherwise provided in Section 4.5; and

(c) During the continuance of the Joint Venture, the Managing Venturers shall diligently and faithfully devote such time to the management of the business of the Joint Venture as may be necessary to conduct it for the greatest advantage of the Joint Venture and the Managing Venturers shall render to all Venturers, whenever reasonably requested by at least a majority in interest of the Additional Venturers, a just and faithful account of all dealings and transactions in relation to the business of the Joint Venture.

(d) The Managing Venturers shall, upon receipt thereof from the holder of any Joint Venture loan or debt, give prompt notice with all relevant particulars then known by the Managing Venturers to all Venturers of any alleged notice of default of the Joint Venture or any offer in connection with any proposed sale or disposition of all or substantially all of the rights to the Condominium, other than in the ordinary course of the Joint Venture's business.

Section 4.4  Liability; Indemnification.  The Managing Venturers, or any one of them, shall not be liable to the Joint Venture for any act or omission performed or omitted by any one of them pursuant to the authority granted to him by this Agreement, other than for his breach of any of his obligations under this Agreement, fraud, bad faith, willful malfeasance or gross negligence. Each Managing Venturer shall and hereby does indemnify and save harmless the Joint Venture and each of the Venturers from any loss, damage, claim or liability, including but not limited to reasonable attorneys' fees and expenses, due to or arising out of breach of any of his obligations under this Agreement, fraud, bad faith, willful malfeasance or gross negligence. The Joint Venture shall and hereby does indemnify and save harmless each Managing Venturer from any loss, damage, claim or liability, including but not limited to reasonable attorneys' fees and

expenses, incurred by him by reason of any act performed by him on behalf of the Joint Venture or in furtherance of the Joint Venture's interest other than for breach of any of his obligations under this Agreement, fraud, bad faith, willful malfeasance or gross negligence, provided however, that the indemnity and save harmless provided for in this sentence shall be satisfied out of Joint Venture assets only and no Venturer shall have any personal liability on account thereof.

Section 4.5   Fees.   In no event shall any of the Managing Venturers receive a fee for services rendered to the Venture except that they may receive reimbursement for actual out-of-pocket expenses and except for the providing of services-as a real estate broker in the sale of the Condominium, so long as the total for such brokerage services does not exceed that which is customary in the area where the Condominium is located.   Freeman shall receive Twenty-One Thousand Dollars ($21,000.00) as a real estate commission for his efforts in effectuating the Exchange.   The Joint Venture has advanced Five Thousand Dollars ($5,000.00) to Freeman in partial satisfaction of such commission.   Upon the closing of the Exchange the Joint Venture will deliver the remaining Sixteen Thousand Dollars ($16,000.00) of such commission to Freeman.   If for any reason the Exchange shall fail to occur on or before January 10, 1984, Freeman shall return the Five Thousand Dollars ($5,000) to the Joint Venture within one (1) day after such date.

Section 4.6   Power of Attorney.   Each Venturer hereby grants Mike McAuley, with full power of substitution, an irrevocable, special power of attorney, coupled with any interest, which shall survive the death, incompetency or legal disability of such Venturer to:

   (a)   Execute and deliver all such documents and instruments as are necessary to effectuate the Exchange, including, but not limited to, the Condominium Agreement; and

   (b)   Execute and deliver all such documents as are necessary to effectuate the refinancing of the Condominium, including, but not limited to, a promissory note and a deed of trust.

ARTICLE V

ACCOUNTING AND DISTRIBUTIONS

Section 5.1   Tax Status.   Any provision hereof to the contrary notwithstanding solely for United States federal income tax purposes, each of the Venturers hereby recognizes that the Joint Venture will be subject to all provisions of Subchapter K of Chapter 1 of Subtitle A of the United States Internal Revenue Code of 1954, as amended (the "Code"); provided, however, the filing of U.S. Partnership Returns of Income shall not be construed to extend the purposes of the Joint Venture or expand the obligations or liabilities of the Venturers. McAuley is hereby designated as the "Tax Matters Partner" for the Partnership, as that term is defined in Section 6231 of the Code.

Section   5.2   Allocations Relating to Joint Venture Operations. From and after the date hereof, all income, gains, losses, deductions and credits resulting from the operations of the Joint Venture shall be allocated to the Venturers in the same ratio (not taking into account the distributions for repayment of loans to the Venture) in which cash is distributed pursuant to Section 5.3.

Section 5.3   Distributions to the Venturers.

   (a)   The Cash Flow (used herein to mean the excess of cash receipts over cash expenditures) and Capital Receipts (used herein to mean the net cash proceeds (after payment of, or due provision for, all recourse liabilities to creditors of the Venture) from (1) any financing or refinancings (from time to time) of any indebtedness of the Venture, (2) the sale, lease or rental of the Condominium, or any portion thereof, (3) the condemnation of or

the taking by power of eminent domain of the Condominium or any portion thereof, or (4) title or fire and extended coverage insurance on the Condominium (provided, however, that any proceeds received from any condemnation or taking by eminent domain or title or fire and extended coverage may be subject to the requirements of creditors of the Joint Venture); of the Joint Venture shall be distributed among the Venturers as follows:

    (i)   To the repayment of any loans made to the Joint Venture by the Venturers.

    (ii)   Next, to the Additional Venturers proportionately in the amounts and to the extent of their respective capital contributions.

    (iii)   Thereafter, any remaining amounts shall be distributed to the Venturers in accordance with their percentages as reflected on Exhibit "A".

(b) Distributions received by the Joint Venture shall be distributed to the Venturers pursuant to subparagraph (a) above within thirty (30) days after receipt by the Joint Venture, or at such earlier time or times as the Venturers may deem appropriate.

(c) No interest shall be paid to any Venturer on any amount in his capital account.

Section 5.4   Accounting

(a) A separate capital account shall be maintained for each Venturer in accordance with Section 3.7.

(b) The books of account and records shall be maintained using the accrual method of accounting, with respect to the Joint Venture's business and financial affairs, which shall be subject to inspection by the Venturers in accordance with law.

(c) The Managing Venturers shall cause annual financial statements of the Joint Venture to be prepared and sent to the Venturers' not later than sixty (60) days after the close of each Fiscal Year.

(d) The Managing Venturers shall prepare or cause to be prepared all tax returns and statements, if any, which must be filed on behalf of the Joint Venture with any taxing authority, including U.S. Partnership Returns of Income, and shall submit such returns and statements to all the Venturers for their approval prior to filing, and, upon approval thereof by all the Venturers, make timely filing thereof.

(e) Each Venturer shall have the right at his own expense, himself or through his authorized agents, at all reasonable times during usual business hours to audit, examine, and make copies of or extracts from the books of account of the Joint Venture.

## ARTICLE VI

### USE OF THE CONDOMINIUM

Section 6.1   Venturers Rights in the Property.   Each Venturer and Griffin [as defined in Section 7.1(d)] shall have the exclusive right to occupy the Property and/or to authorize others to do so for two (2) weeks in each year, subject to the rights reserved in this Agreement and subject to the easements and rights reserved by the seller of the Condominium in the Condominium Agreement, the Condominium Declaration relating to the Condominium or in any other document to which the Condominium is, or becomes subject ("Condominium Instruments"). The right to enjoy the common elements of the complex (the "Condominium Complex") surrounding

SECOND REVISED JOINT VENTURE AGREEMENT - Page 8

the Condominium shall be subject to the rights of other owners of other Condominium units or other portions of such complex and shall be subject to any rights reserved in instruments of record prior to the date of this Agreement.

Section 6.2  Scheduling of Use Weeks.  On or before August 15 of each year, each Venturer and Griffin shall advise the Managing Venturers which set of use weeks ("Use Weeks" or singularly "Use Week") he desires to have during the twelve (12) months commencing with October 1 of that year.  The Venture Managers shall use their best efforts to provide each Venturer and Griffin the Use Weeks he requests, however, the final determination of which Use Weeks are used by a Venturer and Griffin shall be determined by the Managing Venturers in their sole discretion.  The Managing Venturers shall notify the Venturers and Griffin of the Use Week schedule on or before September 15 of each year.  All notices to Griffin shall be made as set forth in Section 10.1 to 702 Greenwood, Fair Hope, Alabama 36532 or such other address as Griffin may designate.

Section 6.3  Period of a Use Week.  Each Use Week shall commence at noon of the first date of the Use Week and shall expire at noon on the last day of the Use Week.

Section 6.4  Furnishings.  All furniture, appliances, housewares, decorations, window treatments (collectively Furnishings) shall be the property of the Venture.  The Manager Venturers shall have the right and obligation to maintain, repair, alter, sell and replace by purchase or lease such Furnishings in such manner as the Managing Venturers in their sole discretion deem appropriate.  All expenses incurred by the Managing Venturers pursuant to this Section 6.4 shall be expenses of the Venture.

Section 6.5  Restrictions on Use of the Property.  Each Venturer and Griffin shall comply with the following restrictions:

(a)  All restrictions in the Condominium Instruments.

(b)  Each Venturer and Griffin shall be responsible during his respective Use Weeks, whether occupied by the Venturer, Griffin or their respective authorized guests ("Guests"), for keeping the Condominium in good condition and repair and for the Condominium being in good and sanitary condition upon the conclusion of such Use Week.

(c)  Each Venturer, Griffin and their respective Guests shall vacate the Property at the expiration of each Use Week in compliance with the checkout times and other procedures as set forth herein and as may from time to time be prescribed by the Managing Venturers.  Failure to vacate the premises in a timely manner shall give rise to fines and other actions as set forth in this Agreement.

(d)  Each Venturer and Griffin shall be responsible during his respective Use Weeks, whether the Condominium is occupied by the Venturer, Griffin or their respective Guests, for maintaining the Furnishings in good condition and repair and shall not remove them from the Condominium Unit nor shall such Venturer, Griffin or their respective Guests make any alteration, improvement, replacement or other change in such Furnishings.  An inventory of Furnishings may be conducted upon check out at the end of each Use Week by a person designated by the Managing Venturers.  All missing items or damage to items shall be charged to the Venturer or Griffin who was scheduled to use such Use Week, notwithstanding the fact that the Property was occupied by Guests of the Venturer or of Griffin.

(e)  No noxious or offensive activity shall be carried on at the Condominium or Condominium Complex nor shall anything be done or placed in the Condominium Unit or upon any other portion of the Condominium which in the sole discretion of the Managing Venturers, interferes with or jeopardizes the enjoyment of other

Venturers, Griffin or owners of other Condominium Units or of other portions of the Condominium Complex, or which is a source of annoyance to other Venturers, Griffin or other condominium owners in the Condominium Complex. While at the Condominium Complex, the Venturers, Griffin and their respective Guests shall exercise extreme care not to make noise which may disturb other condominium unit occupants in the Condominium Complex. No unlawful use shall be made of the Condominium Complex nor any part thereof, and all valid laws, zoning ordinances and regulations of all governmental bodies having jurisdiction thereof shall be observed.

(f) Nothing shall be done or kept in the Condominium which will increase the cost of insurance on the Condominium without prior approval of the Managing Venturers. Each Venturer and Griffin shall prevent the occurrence of any activities or the keeping of anything in the Condominium Unit during his respective Use Weeks or at the Condominium Complex which will result in a cancellation of insurance on the Condominium Complex or any portion thereof.

(g) Neither Griffin, nor any Venturer other than the Managing Venturers nor any Guests shall have the authority to nor shall any they make any changes in the interior decor of the Condominium Unit or any other alteration or improvement in the Condominium Unit or the Condominium Complex. The right to make such changes, alterations, improvements is vested in the Managing Venturers and is subject to any restrictions in the Condominium Instruments.

(h) No Venturer, Griffin or any respective Guests thereof shall at anytime allow any pets in the Condominium.

Section 6.6 Condominium Association. The Managing Venturers shall determine which, if any, condominium associations the Venture shall belong and the Managing Venturers shall, represent the Venturers in such association. The Managing Venturers shall cast all votes allocated to the Condominium Unit or allocated to the Venture as the owner thereof, in the manner determined by them to be in the best interests of the Venture. The Venturers hereby agree to be bound by such votes and in the event that the power provided to the Managing Venturers herein is deemed to be a proxy, expressly agree that such proxy shall extend for the term of the Venture which may exceed eleven (11) months.

Section 6.7 Failure to Observe Covenants. In the event any Venturer, Griffin, or their respective Guests shall violate any section of this Article VI, the Venture acting through the Managing Venturers shall notify such Venturer, or Griffin, as the case may be, in writing that the violations exist and may then:

(a) temporarily reduce the length of Use Weeks or the number thereof; and/or

(b) Impose fines or other sanctions upon the Venturer or Griffin as the Managing Venturers deem appropriate. Such fines may be used to offset costs of the Venture related to such violations, such as the cost of renting accommodations for another Venturer, Griffin or their respective Guests if such violator does not promptly vacate the Condominium and the balance shall be paid into such funds as the Managing Venturers shall determine.

Section 6.8 Substantial Default.

(a) In the event the Venture Managers in their sole discretion determine that any violation of any Section of this Article VI, is substantial and such violation shall continue for a period of fifteen (15) days after written notice from the Managing Venturers is provided to the defaulting Venturer of the same, in addition to being personally liable; such defaulting Venturer shall

become an inactive Venturer and during the continuance of such default shall lose all rights with respect to the Venture including, but not limited to, the right to occupy the Condominium during such Venturer's Use Weeks during such period of default and such interest shall be sold as set forth in Section 3.3.

(b) In the event the Venture Managers in their sole discretion determine that any violation of any section of this Article VI by Griffin is substantial and such violation shall continue for a period of fifteen (15) days after written notice from the Managing Venturers is provided to Griffin of the same, in addition to being personally liable; Griffin shall permanently lose all rights to have any Use Weeks and correspondingly shall lose all rights to occupy the Condominium.

Section 6.9   Condemnation.   If any portion of the Condominium Complex is made the subject matter of any condemnation or eminant domain proceeding or is otherwise sought to be acquired by a condemning authority, notice of the proceeding shall be given to each Venturer by the Managing Venturers within ten (10) days after such Managing Venturers receive knowledge thereof.   The Managing Venturers shall represent the Venture in any condemnation proceeding or negotiations, settlements, and agreements with the condemning authority for acquisition of any portion of the Condominium Complex and are hereby appointed as the attorney-in-fact for such purposes and for handling the proceeds thereof.   If such condemnation is deemed by the Managing Venturers to substantially destroy the purpose of the Venture then the Venture shall be dissolved as set forth in Article IX, otherwise the proceeds of such proceeding shall be utilized for the benefit of the Venture in accordance with this Agreement or distributed as set forth in Section 5.3.

Section 6.10   Damage or Destruction.   If any portion of the Condominium Complex is substantially destroyed or damaged, notice shall be given to each Venturer.   If such destruction or damage is deemed by the Managing Venturers to substantially destroy the purpose of the Venture the Venture shall be dissolved as set forth in Article IX, otherwise the insurance proceeds, if any, shall be utilized for the benefit of the Venture in accordance with this Agreement or distributed as set forth in Section 5.3.

ARTICLE VII

TRANSFER OF A JOINT VENTURE INTEREST

Section 7.1   Assignment, General Conditions:

(a) Except as set forth in Article VI and as herein expressly provided, the interest of a Venturer in the Joint Venture may not be assigned, sold, transferred, hypothecated or otherwise disposed of without the prior written consent of sixty percent (60%) in interest of the Venturers.   Upon the default of a Venturer to make additional capital contributions, the defaulting Venturer's rights are governed by Section 3.3 unless agreed to the contrary by the unanimous consent of the Venturers.   In the case of any assignment, sale, transfer, hypothecation or other disposal of an interest of a Venturer, in violation of this Article, the Joint Venture shall be entitled to treat the Venturer or the recipient of his Venture interest or both, as the absolute owner of such portions of such interest in the Venture as the Managing Venturers determine and shall incur no liability for distributions made in good faith to such Venturer or to such recipient.

(b) The admission of any person or entity as a substituted Venturer pursuant to this Section 7.1 (whether by assignment or otherwise) shall be conditioned upon (i) the above-described foregoing consent of the Venturer(s) to such admission, (ii) the substituted Venturer's written acceptance and adoption of all of the terms and provisions of this Agreement, and (iii) the substituted Venturer's paying or obligating himself to pay all reasonable expenses connected with such admission.   The substitution of a

Venturer shall not terminate the Joint Venture, but the Joint Venture shall survive and continue as such.

(c)  As a part of any purchase by any Venturer of the interest of the other Venturer hereunder at the time of closing of such purchase, and as a condition to the consummation thereof, the acquiring Venturer shall cause the selling Venturer to be fully and completely relieved and released from any and all liability with respect to all debts, obligations and liabilities of the Joint Venture.  In the event that the acquiring Venturer is unable to obtain any such release, then the acquiring Venturer shall agree to fully indemnify and hold the selling Venturer harmless from such liability.  No transfer of the interest of any Venturer in the Joint Venture shall affect the right of such Venturer to be repaid for all loans previously made to the Joint Venture, unless otherwise agreed upon.

(d)  Notwithstanding anything to the contrary, the Venturers hereby acknowledge and approve the assignment by Freeman of twenty-five percent (25%) of Freeman's interest in the Venture to Robert Griffin ("Griffin") and acknowledge and approve the grant by the Venture (subject to Article VI) of two (2) Use Weeks per year to Griffin which are in addition to the two (2) Use Weeks per year attributable to Freeman as a Venturer.  Griffin shall have no voting rights with respect to the Venture, however, the Venture shall be entitled to treat Griffin as the assignee of twenty-five percent (25%) of Freeman's interest in the Venture and the Venture shall incur no liability for distributions or payments made to Griffin in recognition of such assignment.

Section 7.2   Right of First Refusal

(a)  In the event that any Venturer (the "Selling Venturer") shall desire to sell all or any portion of its interest in the Joint Venture to any third party and it shall have received a bona fide written offer therefor which is acceptable to it, it shall, not less than ten (10) days prior to the date of the proposed sale, give notice (the "Notice of Sale") to the other Venturers (the "Remaining Venturers").  The Notice of Sale shall state that a bona fide offer has been received by the Selling Venturer from such third party and shall contain the following information:  (i) The portion of the Selling Venturer's interest in the Joint Venture offered for sale; (ii) The price, terms and conditions of sale; and (iii) The name and address of the third party to whom such interest is proposed to be sold.  The Notice of Sale shall further contain an affirmative offer by the Selling Venturer to sell its interest in the Joint Venture or the portion thereof offered for sale, to the Remaining Venturers for the same consideration and upon the same terms and conditions set forth in the Notice of Sale.

(b)  The Remaining Venturers shall have the option, for a period of ten (10) days from the date of such Notice of Sale, within which to exercise their option to purchase the Selling Venturer's interest.  In the event the Remaining Venturers elect to acquire the Selling Venturer's interest, they shall notify such Selling Venturer of such election in writing prior to the expiration of the ten-day period.  The closing shall take place at the offices of the Joint Venture at such time, not later than thirty (30) days after the expiration of the option period, as the Selling Venturer and the Remaining Venturers may agree to in writing.

(c)  In the event that the Remaining Partners exercise their option to purchase, in the aggregate, less than the entire interest of the Selling Venturer which was offered for sale, the Selling Venturer shall have the right to sell such interest strictly in accordance with the terms of the Notice of Sale.  If no such sale is made within thirty (30) days following the expiration of the option period, a new Notice of Sale shall be required in the manner provided hereinbefore.

Section 7.3  Buy-Sell Agreement

(a)  In the event that any Venturer or Venturers (the "Offering Venturers"), who are not in default in its obligations under this Agreement, is at any time willing to make an offer to any of the other Venturers or Venturer (the "Remaining Venturers") to purchase their interest in the Joint Venture, the Offering Venturers shall notify the Remaining Venturers in writing of their desire to do so, designating in such notice the price at which their will either sell their interest in the Joint Venture or buy the interest of the Remaining Venturers. Such price shall be stated in terms of the price attributable to one hundred percent (100%) of the Joint Venture, and in making the determination of such price, all outstanding loans made by Venturers to the Joint Venture shall be included in the computation and such loans shall be retired upon the consummation of the sale, either by payment to the Venturer who made the loan in the event it is a Selling Venturer, or by giving it a credit on the price in the event it is a purchasing Venturer. The Offering Venturers shall then be obligated either:  (i) to purchase the interest of the Remaining Venturers in the Joint Venture at a price equal to the 100% price referred to above multiplied by the percentage interest of the Remaining Venturer in the Joint Venture; or (ii) to sell to the Remaining Venturers the Offering Venturers' interest in the Joint Venture at a price equal to the 100% price referred to above multiplied by the Offering Venturers' percentage interest in the Joint Venture. The Notice shall specify the portion of the purchase price to be payable in cash and the terms and conditions with respect to the balance of the consideration. On or before ten (10) days from the date of the receipt of such notice the Remaining Venturers shall notify the Offering Venturers if they desire to purchase the interest in the Joint Venture of the Offering Venturers or sell the Remaining Venturers' interest in the Joint Venture upon the terms and conditions set forth in such notice. If no such notice is provided the Offering Venturers shall purchase the Remaining Venturer's interest in the Joint Venture upon the terms and conditions set forth in the original notice given by the Offering Venturers.

(c)  Any sale and purchase of an interest in the Joint Venture in accordance with the provisions of this Section 7.3 shall be closed on the tenth (10th) day after the determination of which of the Venturers is to purchase in the interest of the other in the Joint Venture as above provided (in the event that such tenth day is a Saturday, Sunday or other business holiday, then such closing shall take place on the next succeeding business day) and all requisite documents, instruments and papers shall be signed at the office of the Joint Venture on the day fixed for such closing. All expenses and fees, including legal fees, incurred in connection with any such closing shall be paid equally by the selling and purchasing Venturer.

Section 7.4  Failure to Close.  In the event the Selling Venturer or the Remaining Venturers shall, by operation of the provisions of Section 7.2 or 7.3 have acquired the right to purchase a Venturer's interest and shall fail to close such purchase and sale within the time period provided in Section 7.2(b) or 7.3(c) the Venturer whose Joint Venture interest was to be sold shall have the right to acquire the other Joint Venture interests upon the same terms and conditions as he would have been required to sell his Joint Venture interest; provided, however, the purchase price for such Joint Venture interest shall be reduced by forty percent (40%).

## ARTICLE VIII

### DEATH OF A VENTURER

Section 8.1  Obligation to Offer and Purchase.  Upon the death of a Venturer, his estate is hereby obligated to offer the Deceased Venturer's Interest to the Joint Venture and the Joint Venture shall have the option to purchase such interest from the estate of the Deceased Venturer at the value (hereinafter "Purchase Price") determined pursuant to an independent appraisal of the assets of the Joint Venture by an independent appraiser selected by the Venture Managers (the cost of which shall be borne by the Estate) as of the date of death.  Such option shall terminate if the Joint Venture fails to provide notice to the estate of such Deceased Venturer within six (6) months after the Joint Venture receives actual notice of the death of such Deceased Venturer, of the Joint Venture's desire to exercise such option.

Section 8.2  Payment.  Twenty-nine percent (29%) of the Purchase Price shall be paid to the estate of the Deceased Venturer in cash within 270 days after the date of the death of the Deceased Venturer.  The remainder of the Purchase Price shall be paid in five annual installments, the first of which shall be due and payable one year and nine months following the date of the Deceased Venturer's death.  The first such payment shall be the greater of twenty percent (20%) of the remaining unpaid Purchase Price or any remaining life insurance proceeds not previously utilized to make the first payment to the estate of the Deceased Venturer within 270 days after his death.  The remaining four annual installments shall be in equal amounts. To evidence the indebtedness and the obligations to pay the five annual installments of the Purchase Price, the Joint Venture shall execute and deliver unto the Deceased Venturer's administrator, executor or personal representative, a note payable which shall reflect the above described payment terms.  Further, the note shall provide for interest to be paid at the rate of ten percent (10%).  Such interest shall be paid annually as it accrued and shall be due and payable upon the dates prescribed for the payment of principal.

Section 8.3  Adjustment to Capital Accounts and Interests in Joint Venture Profits.  The amount of the Purchase Price shall first be charged or debited to the Capital Account of the deceased Venturer and after such Capital Account shall be reduced to zero, such payments shall be charged or debited to the Capital Accounts of the surviving Venturers in the ratios which their respective interests in the Joint Venture bear to the total of all such surviving Venturers' interests in the Joint Venture as defined in Article II.  The interest in the Joint Venture of a deceased Venturer shall be allocated to the surviving Venturers in the ratios which their respective interests in the Joint Venture bear to the total of all such remaining or surviving Venturers' interests in the Joint Venture.

## ARTICLE IX

DISSOLUTION AND TERMINATION OF THE JOINT VENTURE;
WINDING UP, LIQUIDATION AND DISTRIBUTION ON
TERMINATION

Section 9.1  Dissolution.  The Joint Venture shall dissolve upon the occurrence of any of the following events:

(a)  Upon the sale by the Joint Venture of all of the assets of the Joint Venture.

(b)  Upon the agreement of all the Venturers.

(c)  Upon the condemnation of the Condominium Complex or a portion thereof, which as set forth in Section 6.9, the Managing Venturers deem to substantially destroy the purpose of the Venture.

(d)  Upon the substantial destruction or substantial damage to the Condominium Complex, which as set forth in Section 6.10, the Managing Ventures deem to substantially destroy the purpose of the Venture.

(e)  Upon the happening of any of the following events:

(i)  A decree or order by a court of competent jurisdiction shall be entered either:

A.  issuing an order for relief of a Venturer or approving a petition seeking an arrangement of the debts of a Venturer under the Bankruptcy Reform Act or any other similar applicable federal statute or state law, or

B.  appointing a receiver or trustee or assignee in bankruptcy or insolvency of a Venturer or a receiver of all or any substantial portion of its property;

and any such decree or order shall be continued in force undischarged or unstayed for a period of sixty (60) days; or

(ii)  A Venturer shall:

A.  institute proceeding requesting an order for relief under the Bankruptcy Reform Act or file a petition or answer or consent seeking arrangement under the Bankruptcy Reform Act or any other similar applicable federal or state law, or consent to the filing of any such petition, or

B.  consent to the appointment of a receiver or trustee or assignee in bankruptcy or insolvency of it or for any or all of substantially all of its property or make a general assignment for the benefit of creditors, or admit in writing its inability to pay its debts generally as they become due, or

C.  dissolve, merge with or into another entity, or otherwise fail to maintain its corporate or trust existence (as the case may be); provided that in such case the non-affected Venturer may elect by written notice to the affected Venturer within twenty (20) days after receipt of notice of the occurrence of such event to continue the existence of the Joint Venture, in which event the successor in interest to the affected Venturer shall thereupon succeed to its interest in the Joint Venture, subject to the provisions of subsection 7.2(b) heretofore.

(f)  Upon the death of any Venturer.

(g)  Upon the occurrence of any of the events described in Section 9.1(e) with respect to the Joint Venture.

Section 9.2  Right to Continue

(a)  If dissolution occurs pursuant to Section 9.1(e) or Section 9.1(f), the remaining non-affected Venturers shall have the right to continue the Joint Venture business under the same name, by themselves or with any other person or persons they may select.  If the remaining Venturers desire to continue the business, but not together, the Joint Venture shall be liquidated as set forth in Section 9.3.  It shall be assumed that the Joint Venture business is being continued by the remaining non-affected

Venturers unless a liquidating trustee is named within a reasonable time by the Venturers as set forth in Section 9.3.

(b) If the remaining non-affected Venturers continue the Joint Venture business as set forth in Section 9.2(a), they shall pay to the other Venturer or his legal representatives, the value of his Joint Venture interest as of the date of dissolution determined pursuant to Article VIII as if such Venturer had died on the date of dissolution and such payment shall be made in the manner set forth in Article VIII.

Section 9.3  Winding Up and Liquidation

(a) Upon the dissolution of the Joint Venture by agreement of the Venturers, or otherwise, in accordance with this Agreement if the remaining Venturers do not continue the Joint Venture as set forth in Section 9.2, its business shall be wound up and liquidated as rapidly as business circumstances will permit, and the liquidation and winding up of the Joint Venture shall be handled by a liquidating trustee, who shall be named by the Venturers acting jointly, unless dissolution takes place under Section 9.1(e) or (f) of this Agreement, in which case the liquidating trustee shall be determined by the non-affected Venturers. In the event such liquidating trustee shall fail or refuse to act, or shall cease or be unable to serve as liquidating trustee, or in the event the parties cannot agree on a liquidating trustee, then the liquidating trustee shall be InterFirst Bank Dallas, N.A., Dallas, Texas. The winding up and liquidation shall consist of the use, application and distribution of the assets and properties of the Joint Venture as provided hereinbelow in paragraph (d) of this Section 9.2, and at its conclusion the Joint Venture will terminate.

(b) The liquidating trustee, whether original or successor, individual or corporate, shall not be liable for any action taken or omitted in its capacity as liquidating trustee hereunder except for its own gross negligence or willful misconduct.

(c) Any corporate liquidating trustee shall be entitled to reasonable compensation commensurate with the duties and responsibilities involved, but no individual trustee shall receive compensation for his services unless expressly approved by the Venturers selecting such trustee.

(d) All of the assets of the Joint Venture, including, but without limitation, the proceeds of sales, if any, of the Joint Venture Property or any portion thereof, and all other cash and property, if any, then on hand in the Joint Venture shall, subject to the provisions of Section 9.2 hereof, be applied as provided in Section 5.3.

---

ARTICLE X

GENERAL

Section 10.1  Notices.  Any notice to be given or to be served upon any party hereto, in connection with this Agreement, must be in writing, and may be effected by personal delivery or by registered or certified mail to the parties hereto at the addresses set forth on Exhibit "A". Any party may change his or its address by written notice in accordance with this Section. Notices delivered personally shall be deemed communicated when signed for at the address provided herein by a representative of the party for whom such notice is being give. Mailed notices shall be deemed communicated three (3) days after mailing with prepaid postage.

Section 10.2  Amendment.  Except as otherwise stated in this Agreement, this Agreement may only be amended or modified with the written consent of the Venturers.

Section 10.3   Integration.   This Agreement, including exhibits hereto, constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior or contemporaneous agreements and understandings of the parties in connection therewith.   No covenant, representation, or condition not expressed in this Agreement shall be binding upon the parties hereto or shall affect or be effective to interpret, change or restrict the provisions of this Agreement.   No change, termination, or attempted waiver of any of the provisions hereof shall be binding unless in writing signed by all Venturers.

Section 10.4   Partition.   Having previously been advised of their respective rights to bring an action for partition, each of the Venturers hereby irrevocably waives for the duration of this Agreement any and all rights that it may have to maintain an action for partition with respect to such party's interest in the Property or to compel any sale thereof under the Statutes of the State of Texas, or any amendment thereof.   In connection with the foregoing, the Venturers acknowledge and agree that each of them has been induced to enter into this Agreement in reliance on the aforementioned waiver and warranty of the other, and without such waiver no Venturer would have entered into this Agreement.   No Venturer has any interest in specific Joint Venture property but the interests of the Venturers in the Joint Venture are, for purposes of partnership and property law, personal property.

Section 10.5   Headings.   Descriptive headings are for convenience only and shall not control or affect the meaning or construction of any provision of this Agreement.

Section 10.6   Severability.   Each provision in this Agreement is intended to be several.   If any term or provision is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity of this Agreement.

Section 10.7   Certain Elections.   Where a distribution of property is made in the manner provided in Section 734 of the Internal Revenue Code of 1954, or where a transfer of a Joint Venture Interest permitted by this Agreement is made in the manner provided in Section 743 of such Code, the Managing Venturer shall file on behalf of the Joint Venture upon any Venturers request an election under Section 754 of such Code in accordance with the procedures set forth in the applicable Treasury Regulations.   Except insofar as an election pursuant to Section 754 has been made with respect to the interest of any Venturer, the determination of profits, losses, distributions, and capital accounts shall be made as provided for in this Agreement.   With respect to any Venturer whose interest has been affected by an election pursuant to Section 754, appropriate adjustment shall be made with respect to the determination of profits, losses, distributions, and capital accounts.   Each Venturer agrees to provide the Managing Venturers with all information necessary to give effect to such election.

Section 10.8   Governing Laws.   This Agreement shall be construed and enforced in accordance with the laws of the State of Texas and all obligations are performable in Dallas County, Texas.

Section 10.9   Binding Agreement.   Subject to the restrictions on transfers and encumbrances set forth herein, this Agreement shall inure to the benefit of and be binding upon the Venturers and their respective heirs, executors, legal representatives, successors, and assigns.

Section 10.10   Multiple Counterparts.   This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument.

EXECUTED EFFECTIVE AS OF THE DAY AND YEAR FIRST ABOVE WRITTEN.

(Attach Signature Pages and Acknowledgements Hereto)

 

EXHIBIT "A"

TO THE JOINT VENTURE AGREEMENT

CAPITAL CONTRIBUTIONS OF THE VENTURERS

|  | Share of Interest |
|---|---|
| Initial Venturers' Interest | 50% |
| Additional Venturers' Interest | 50% |
| TOTAL | 100% |

| Initial Venturers: | Initial Contributions | Percentage of Initial Venturers' Interest |
|---|---|---|
| Mike McAuley | Contract rights to purchase the Venture property; improvement plans & specifications; sewage disposal permits | 40% |
| J. Patrick Duffy | Contract rights to purchase the Venture property; improvement plans & specifications; sewage disposal permits | 20% |
| David B. Freeman, III | Ownership rights in the Venture Property; improvement plans & specifications; sewage disposal permits | 40% |
| TOTAL OF INITIAL VENTURERS' INTEREST | | 100% |

| Additional Venturers: | Original Capital Contribution due no later than August 31, 1981 | Percentage of Additional Venturer's Interest |
|---|---|---|
| David McDavid<br>3700 Airport Frwy.<br>Irving, TX 75062 | $11,000.00 | 6.6666% |
| Ted Elkins<br>301 S. Sherman St.<br>Richardson, TX 75081 | $11,000.00 | 6.6666% |
| Ben Parker<br>4501 El Ridge Lane<br>Garland, TX 75042 | $11,000.00 | 6.6666% |

|  |  |  |
|---|---|---|
|  | $11,000.00 | 6.6666% |
| John Sweet<br>344 S. 68th St.<br>Boulder, CO 80303 | $11,000.00 | 6.6666% |
| Jack Irons<br>630 Fidelity Union Tower<br>Dallas, TX 75201 | $11,000.00 | 6.6666% |
| Sloan Leonard<br>3545 Centenary<br>Dallas TX 75225 | $11,000.00 | 6.6666% |
| Bob Henderson<br>6161 Harry Hines #106<br>Dallas, TX 75235 | $11,000.00 | 6.6666% |
| Van Telford<br>7508 Mason Dells<br>Dallas, TX 75230 | $11,000.00 | 6.6666% |
| Vick Trammel<br>500 Omega<br>Arlington, TX 76014 | $11,000.00 | 6.6666% |
| Steve Shaper<br>P.O. Box 125<br>Houston, TX 77001 | $11,000.00 | 6.6666% |
| Steve Shaper<br>P.O. Box 125<br>Houston, TX 77001 | $11,000.00 | 6.6666% |
| Bob Mayer<br>16990 Dallas Pkwy #110<br>Dallas, TX 75248 | $11,000.00 | 6.6666% |
| Jim Sime<br>16990 Dallas Pkwy #110<br>Dallas, TX 75248 | $11,000.00 | 6.6666% |
| Ray Sudderth<br>Box 351<br>Leonard, TX 75452 | $11,000.00 | 6.6666% |
| Steve Redfern<br>12140 Webbs Chapel #256<br>Dallas, TX 75234 |  | 100% |

TOTAL ADDITIONAL VENTURERS' INTEREST

EXHIBIT "A" TO JOINT VENTURE AGREEMENT - Page 2

## SECOND AMENDMENT TO EXCHANGE AGREEMENT

This SECOND AMENDMENT TO EXCHANGE AGREEMENT is made and entered into this 15th day of JULY , 1983 by and between PINE BROOK LAKES, INC., a corporation ("Owner No. 1") and MICHAEL S. McAULEY, Individually and as Trustee ("Owner No. 2").

WHEREAS, Owner No. 1 is the owner of Unit Number 1003-4 of SeaSpray, a Condominium (the "Unit"), currently under construction in Escambia County, Florida, as more particularly described in the Exchange Agreement by and between Owner No. 1 and Owner No. 2 (herein so called) dated _____, 1983, which Exchange Agreement has been modified by Amendment to Exchange Agreement by and between Owner No. 1 and Owner No. 2 dated _____, 1983; and

WHEREAS, Owner No. 2 is the owner of certain unimproved real property situated in Escambia County, Florida (the "Land"), as more particularly described in the Exchange Agreement.

NOW, THEREFORE, for and in consideration of the mutual promises, covenants and conditions herein expressed and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Owner No. 1 and Owner No. 2 mutually agree to amend the Exchange Agreement, as previously amended by the Amendment to Exchange Agreement, to provide that notwithstanding anything that may be contained therein to the contrary:

A. The Land to be conveyed by Owner No. 2 to Owner No. 1 pursuant to the Exchange Agreement, as amended, shall be comprised of the surface estate in and to the real property described on Exhibit "A" to the Exchange Agreement, and Owner No. 2 shall expressly reserve unto himself in the conveyance of the Land to Owner No. 1 pursuant to the Exchange Agreement, as amended, all oil, gas and other minerals on, in, under and that may be produced from the real property described on Exhibit "A" to the Exchange Agreement; provided, however, Owner No. 2 shall have no right in and to the surface of the real property described on Exhibit "A" to the Exchange Agreement of any kind or character whatsoever, including, but not limited to, the right of ingress and egress in, over and across the surface of such real property for the purposes of conducting tests, exploring, mining, drilling, completing, operating and developing such real property for oil, gas and other minerals; and further provided, however, that the surface of the real property described on Exhibit "A" to the Exchange Agreement, including the support required for any existing or planned improvements thereon, shall not be undermined or adversely affected by any sub-surface drilling, tunneling or other mining or related activity by Owner No. 2 or his agents, employees, contractors, licensees, lessees, successors or assigns. Nothing herein contained shall be construed as relinquishing any right of Owner No. 2 in and to the oil, gas and other minerals on, in, under and that may be produced from the real property described on Exhibit "A" to the Exchange Agreement or the right of Owner No. 2 to exploit, develop and produce such oil, gas and other minerals by wells drilled at locations outside the real property described on Exhibit "A" to the Exchange Agreement.

B.   During the period prior to closing Owner No. 2 hereby agrees, subject to the conditions and limitations hereinafter provided for, that Owner No. 1 may:  (1) design improvements (the "Improvements") for the real property described on Exhibit "A" to the Exchange Agreement, and make any necessary applications, either in its own name, or in the name of Owner No. 2, to all appropriate governmental agencies for all licenses, permits or other approvals which may be required for the construction of the Improvements; and (b) enter upon said real property and commence and pursue the construction of the Improvements.   This agreement is subject to the following covenants, conditions and limitations:

(a)   All costs associated with the design and construction of the Improvements, including all permits, fees, taxes and other expenses, shall be borne by Owner No. 1, and Owner No. 1 covenants and agrees to hold Owner No. 2 harmless against any such costs, and to not permit any mechanics or materialmen's or other liens to attach to said real property or the Improvements, all which duties and obligations shall survive the termination of the Exchange Agreement and the closing thereunder.

(b)   Owner No. 1 agrees to indemnify Owner No. 2 and hold him harmless from any and all damages, claims, suits, demands and causes of action of all kinds arising out of the design and construction of the Improvements by Owner No. 1 or its employees, contractors, subcontractors or licensees, including all costs, including attorney's fees, incurred by Owner No. 2 in connection therewith; provided, however, that Owner No. 1 shall be afforded the opportunity to defend against any such action at Owner No. 1's sole cost and expense. Owner No. 1 agrees to purchase and maintain such insurance as will protect it and Owner No. 2 from the claims set forth below which may arise out of or result from Owner No. 1's operations in construction of the Improvements, whether such operations be by itself or by any subcontractor or by anyone directly or indirectly employed by it or by anyone for whose acts it may be liable:

-   claims under workers' or workmen's compensation, disability benefit and other similar employee benefit acts;

-   claims for damages because of bodily injury, occupational sickness or disease, or death of Owner No. 1's employees;

-   claims for damages because of bodily injury, sickness or disease, or death of any person other than Owner No. 1's employees;

-   claims for damages incurred by usual personal injury liability coverage which are sustained (1) by any person as a result of an offense directly or indirectly related to the employment of such person by Owner No. 1, or (2) by any other person;

-   claims for damages because of injury to or destruction of tangible property including loss of use resulting therefrom; and

     —   claims for damages because of bodily injury
or death of any person or property damage
arising out of the ownership, maintenance
or use of any motor vehicle.

    The insurance required hereunder shall be written in
amounts and with insurance carriers acceptable to Owner
No. 2.  Certificates of insurance acceptable to Owner No.
2 shall be filed with Owner No. 2 prior to the commencement
of the construction of any Improvements, and such certificates
shall contain a provision that coverages afforded under the
policies will not be cancelled until at least thirty (30)
days prior written notice has been given to Owner No. 2.

    (c)  The design of the Improvements shall be subject to
the approval of Owner No. 2, such approval to not be un-
reasonably withheld.  The design of the Improvements shall
be deemed to have been approved by Owner No. 2 within five
(5) days of his receipt of a site plan and drawings
describing the Improvements in sufficient detail to permit
Owner No. 1 to apply for a building permit for the construction
of the Improvements unless Owner No. 2 shall have objected
thereto as evidenced by notice in writing given in accordance
with the provisions of paragraph 12 of the Exchange Agreement
prior to the expiration of said five day period.  In the
event Owner No. 2 shall object to the design of the Improve-
ments he covenants and agrees to immediately meet with Owner
No. 1 and its architect to make such modifications as may be
required to eliminate such objections, the parties hereto
hereby stipulating and agreeing that time is of the essence
in securing Owner No. 2's approval of the design of the
Improvements.

    (d)  At closing Owner No. 2 agrees to deed, assign,
set over and transfer to Owner No. 1 all of his right,
title and interest in and to the Improvements.  If for any
reason the exchange contemplated by the Exchange Agreement
is not consummated for any reason other than the default of
Owner No. 2, then Owner No. 2 shall retain all right, title
and interest in and to the Improvements.

    (e)  In the event closing under the Exchange Agreement
shall not be consummated by virtue of a default by Owner No.
1 in the performance of its obligations thereunder, then
Owner No. 1 hereby agrees to transfer and assign to Owner
No. 2 all of its right, title and interest in and to all permits,
including building permits, licenses, plans, specifications,
and drawings related to the design and construction of the
Improvements.

    (f)  In the event closing under the Exchange Agreement
shall not be consummated by virtue of a default by Owner No.
1 in the performance of its obligations thereunder, then
Owner No. 1 agrees to grant to Owner No. 2 a non-exclusive
license and easement for the benefit of the real property
described in Exhibit "A" to the Exchange Agreement to use the
parking facilities, sewer plan and the sewer and water lines
appurtenant to serving the SeaSpray Condominiums; subject,
however, to the receipt by Owner No. 1 of all permits, licenses,
franchises or approvals required of any local, state or federal
governmental agencies necessary to permit such sewer and
water facilities to be made available to the owners of the

Exhibit "A" real property as well as to the owners of the SeaSpray Condominium. In the event the conditions contained in this subparagraph (f) shall have been satisfied Owner No. 2, agrees to execute such documents, upon the request of Owner No. 1, all in form and content satisfactory to Owner No. 1 and Owner No. 2, as may be reasonably required to evidence of record the licenses and easements herein provided for, and in such event Owner No. 1 further agrees to diligently seek to obtain all governmental permits, licenses, franchises or approvals herein provided for.

The Exchange Agreement, as previously amended by the Amendment to Exchange Agreement, and as further amended by this Second Amendment to Exchange Agreement, are hereby ratified, confirmed and approved, and except as hereby amended shall remain in full force and effect.

DATED AND EXECUTED as of the day and year first above written.

OWNER NO. 1

Attest:

PINE BROOK LAKES, INC.

By: _____
Carter S. Kennedy
President

_____
Assistant Secretary

Signed, sealed and delivered
in the presence of:

_____
Witness

_____
Witness

OWNER NO. 2

Signed, sealed and delivered
in the presence of:

_____
Michael F. McAuley, Individually
and as Trustee

_____
Witness

_____
Witness

STATE OF ~~FLORIDA~~ *ALABAMA*)

COUNTY OF ~~ESCAMBIA~~ *MOBILE*)

The foregoing instrument was acknowledged before me this 15th day of *JULY*, 1983, by Carter S. Kennedy, President of Pine Brook Lakes, Inc., an Alabama corporation, on behalf of the corporation.

_____
Notary Public

My Commission Expires: 12/3/86

- 4 -

STATE OF ~~FLORIDA~~ ALABAMA )

COUNTY OF ~~ESCAMBIA~~ MOBILE )


    The foregoing instrument was acknowledged before me this
__15th__ day of __JULY_____, 1983, by Michael F. McAuley,
Individually and as Trustee.

                        _Christine S. Shaw_____
                        Notary Public

                        My Commission Expires: __12/3/86__

- 5 -

01/08/2009 11:03   018308957756         LAND CO OF THE SW                    PAGE  02

Jan 04 09 11:19a    Becky McAuley                       972 788 5487              p.2

## ASSIGNMENT OF JOINT VENTURE INTEREST

THIS AGREEMENT is made by and between Michael F. McAuley, an individual residing in Dallas, Texas (the "Assignee") and David B. Freeman III an individual residing in Daphne, Alabama, (the "Assignor").

### WITNESSETH:

WHEREAS, Assignor desires to assign all of his right, title and interest in Forty Percent (40%) of the Initial Managing Venturers Interest (the "Joint Venture Interest") as set forth in the First Revised Joint Venture Agreement of the PERDIDO KEY JOINT VENTURE, a Texas joint venture (the "Joint Venture") to Assignee in consideration of the payment of One Thousand Seven Hundred Fifty and No/100 Dollars ($1,750.00) in addition to a previous amount owed per a promissory note dated July 2, 1984, of Six Thousand Five Hundred and No/100 Dollars ($6,500.00).

NOW, THEREFORE, in consideration of the premises and of other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto warrant, represent, covenant and agree as follows:

1.  Assignor, as of this date, does hereby assign all of his right, title and interest in the "Joint Venture Interest" of

EXHIBIT
B

01/06/2009  11:03     018308967755          LAND CO OF THE SW                    PAGE  03

Jan 04 09 11:19a      Becky McAuley                     972 788 5487              p.3

the "Joint Venture", to Assignee in consideration for the payment of One Thousand Seven Hundred Fifty and No/100 Dollars ($1,750.00) in addition to a previous amount owed per the promissory note dated July 2, 1984, of Six Thousand Five Hundred and No/100 Dollars ($6,500.00) as delineated above.  Assignee shall be substituted in place of Assignor for the "Joint Venture Interest" in the Perdido Key Joint Venture.

2.  Assignee, as of this date, assumes and shall continue to assume, all of Assignor's obligations and liabilities for the "Joint Venture Interest" under the Joint Venture Agreement or otherwise arising from the Joint Venture business on or after this date in accordance with such Joint Venture Agreement, and Assignee does hereby relieve Assignor from any and all such obligations and liabilities for that "Joint Venture Interest", effective this date.

3.  Assignor hereby warrants, represents and covenants that to the best of his knowledge and belief there are no outstanding obligations or liabilities which are owed to the Joint Venture or to third parties as a result of the Assignor being a joint venturer thereof and to the extent that any such obligations or liabilities ever are manifested as a result of actions of the Joint Venture or of the Assignor before the date of this Agreement and Assignor shall indemnify and hold the Assignee harmless therefrom to the extent of Assignor's obligations.

01/08/2009  11:03     818308967756          LAND CO OF THE SW                    PAGE  04

Jan 04 09 11:19a     Becky McAuley                 972  788  5487              p.4

Assignor agrees that he shall bear his proportionate share of the tax effect of all Joint Venture activities occurring, on an accrual accounting method, prior to the date of this Agreement; and Assignee shall bear his proportionate share of the tax effects of all Joint Venture activities occurring, on an accrual basis accounting method, on and subsequent to the date of this Agreement.

This agreement shall inure to the benefit of the parties hereto, the Joint Venture, and shall bind the heirs, executors, personal representatives, administrators and assigns of the parties hereto.

EXECUTED this ___3¹ˢᵗ___ day of __January__ , 1990.

ASSIGNOR:

_____
David B. Freeman, III

ASSIGNEE:

_____
Michael F. McAuley

3

01/08/2009  11:03      018388967756          LAND CO OF THE SW                    PAGE  05

THE STATE OF _____

COUNTY OF _____

BEFORE ME, the undersigned, a Notary Public in and for said County and State, on this day personally appeared _____ _____, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ day of _____, 1990.

_____
NOTARY PUBLIC in and for the
State of _____

My Commission expires:

_____          _____
                                          (Print name of Notary here)


THE STATE OF _____

COUNTY OF _____

BEFORE ME, the undersigned, a Notary Public in and for said County and State, on this day personally appeared _____ _____, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this the _____ day of _____, 1990.

_____
NOTARY PUBLIC in and for the
State of _____

My Commission expires:

_____          _____
                                          (Print name of Notary here)

4



**GEARY, PORTER & DONOVAN**
A PROFESSIONAL CORPORATION
ATTORNEYS AND COUNSELORS

ONE BENT TREE TOWER
16475 DALLAS PARKWAY, SUITE 400
ADDISON, TEXAS 75001-6837

POST OFFICE BOX 700248
DALLAS, TEXAS 75370-0248

E-MAIL ADDRESS:
jfisher@gpd.com

JEFFREY L. FISHER

DIRECT DIAL NUMBER:
(972) 349-2201

January 12, 2009

**VIA FIRST CLASS MAIL AND**
**CERTIFIED MAIL RETURN RECEIPT**

David B. Freeman III
604 Sandpiper Lane
Daphne, Alabama 36526

   Re:  Perdido Key Joint Venture (the "Joint Venture")

Dear Mr. Freeman:

   As you aware, by Assignment of Joint Venture Interest dated January 31, 1990 (a copy of which is enclosed) you assigned all of your interest in Perdido Key Joint Venture to Michael F. McAuley (the "Joint Venture Interest"). The Joint Venture Interest assigned by you to Mr. McAuley is now owned by Frost National Bank, Trustee of The McAuley Marital Trust U/W dated 3/24/2006 ("The McAuley Trust"). Notwithstanding your assignment of the Joint Venture Interest to Mr. McAuley you have continued to have certain access to the Joint Venture property.

   This firm has been requested by the Perdido Key Joint Venture and The McAuley Trust to give you written notice that effective immediately you will no longer be allowed any access to the Joint Venture property. Please promptly forward any and all keys that you have to the Joint Venture property to me at the address set forth above.

   Your prompt attention to the foregoing is appreciated.

      Very truly yours,

      GEARY, PORTER & DONOVAN,
      A Professional Corporation


      By: _____
         Jeffrey L. Fisher

cc:  Perdido Key Joint Venture
   c/o J. Patrick Duffy, Managing Venturer

   Frost National Bank, Trustee of The McAuley Marital Trust
   Attn: Mary Coane

Enclosure



EXHIBIT
C

(972) 931-9901 • FACSIMILE (972) 931-9208 • www.gpd.com

G:\shared\CLIENTS\14655\50191\FREEMAN LTR2.doc

IRVIN GRODSKY, P.C.
ATTORNEYS AT LAW
454 DAUPHIN STREET
MOBILE, ALABAMA 36602
(251) 433-3657

MAILING ADDRESS:
P.O. BOX 3123
MOBILE, ALABAMA 36652
FAX (251) 433-3670

IRVIN GRODSKY
TERRIE S. OWENS

February 4, 2009

Jeffrey L. Fisher
Attorney at Law
Geary, Porter & Donovan
Post Office Box 700248
Dallas, Texas 75370-0248

      Re:    David B. Freeman, III
              Perdido Key Joint Venture

Dear Mr. Fisher:

    Your letter dated January 12, 2009 to Mr. David B. Freeman III has been received. Please be advised that The McAuley Marital Trust has misconstrued the intent of the Assignment of Joint Venture Interest to which reference is made in your letter. This document was always intended as a pledge agreement to secure repayment of the debts recited in the document which amount was agreed to total $10,000.00. Mr. Freeman had numerous conversations with Mr. McAuley, his cousin, and Mr. McAuley's wife, Becky, regarding the fact that Mr. McAuley wanted the security document solely as collateral. Mr. McAuley on numerous occasions told David Freeman that he could wait to repay the borrowed funds. Even after Mr. McAuley's untimely death, Mr. Freeman's conversations with Becky McAuley indicated that she was aware that the assignment was solely for the purpose of collateralizing the debt.

    Hopefully, the Trustee will consult with the beneficiary of the trust, she will confirm the above, and the Trustee will agree to treat the Assignment in accordance with the intent of the parties. However, if the Trustee wishes to interpret the Assignment literally, please note that the property interest assigned is an interest as set forth in the First Revised Joint Venture Agreement. Mr. Freeman's claim to an interest in the condominium is based on a percentage of the Initial Managing Venturers Interest as set forth in the Second Revised Joint Venture Agreement. The Second Revised Agreement was executed in 1983 and was in existence on January 3, 1990, the date that the Assignment was executed. Clearly, it seems, the parties intended for Mr. Freeman to assign his rights under the first revision and to retain his rights under the second revision. No document purports to assign Mr. Freeman's interest pursuant to the Second Revised Agreement and he still owns it. The condominium unit is owned by the Joint Venture pursuant to the Second Revised Agreement. The Trust has no authority for interfering with Mr. Freeman's right to enjoy his ownership rights.



EXHIBIT
D

Jeffrey L. Fisher
January 4, 2009
Page 2

Furthermore, the Trust is estopped from claiming that Mr. Freeman transferred his interest in the Joint Venture in 1990. Mr. Freeman has provided management services to the joint venture based on his membership interest without any one, including Mr. McAuley, ever contending that Mr. Freeman was not a member and Mr. Freeman has used the condominium unit in accordance with the rights of a member without objection from anyone at all times after the execution of the Assignment. The lockout in January, 2009 came as a complete surprise to him.

Given the foregoing, you are requested to have your client provide Mr. Freeman with a key to the unit, amend the Assignment to make it clear that the document is a pledge agreement, enter into a payment arrangement with Mr. Freeman, return his manager status to him, and accommodate his request for a two week use of the unit.

Please advise of your clients position no later than Monday, February 16, 2009.

Very truly yours,

Irvin Grodsky

IG:ljt
cc:      David B. Freeman, III

Sent By: GEARY PORTER&DONOVAN,P.C.;          9729319901;          16 Feb 09  6.10PM;Job 604;Page 2/3



**GEARY, PORTER & DONOVAN**
A PROFESSIONAL CORPORATION
ATTORNEYS AND COUNSELORS

ONE BENT TREE TOWER
16475 DALLAS PARKWAY, SUITE 400
ADDISON, TEXAS 75001-6837

POST OFFICE BOX 700248
DALLAS, TEXAS 75370-0248

JEFFREY L. FISHER

DIRECT DIAL NUMBER:
(972) 349-2201

E-MAIL ADDRESS:
jfisher@gpd.com

February 16, 2009

**VIA FACSIMILE (251) 433-3670**
**AND FIRST CLASS MAIL**

Mr. Irvin Grodsky
Irvin Grodsky, P.C
Attorneys at Law
454 Dauphin Street
Mobile, Alabama 36602

        Re:    David B. Freeman, III
               Perdido Key Joint Venture (the "Joint Venture")

Dear Mr. Grodsky:

        I am in receipt of your letter dated February 4, 2009. I provided a copy of your letter to Becky McAuley and discussed this matter with her. Based on such discussions I am providing this response to your letter.

        It appears to me that if the parties intended for the Assignment of Joint Venture Interest (the "Assignment") to be a pledge agreement, then they would have entered into a pledge agreement rather than the Assignment. The Assignment is certainly not ambiguous as to its intent to be an assignment of all of Mr. Freeman's joint venture interest in the Joint Venture.

        Mr. McAuley expressly transferred the interest received from Mr. Freeman to The McAuley Marital Trust which is further evidence of Mr. McAuley's intent that the Assignment was an absolute assignment and not merely a security document solely as collateral. Mrs. McAuley does not recall any conversations with her husband regarding the Assignment being intended to be a security document solely as collateral. Mr. Freeman is the only person who has suggested it was meant as such.

        Based on the documents I have been provided, the reference to Mr. Freeman's joint venture interest as an Initial Venturer is the same in both the First Revised Joint Venture Agreement and the Second Revised Joint Venture Agreement. The Assignment assigns all of Mr. Freeman's interest in the Joint Venture. There is no provision in the Assignment that any rights were intended to be



EXHIBIT

E

Sent By: GEARY PORTER&DONOVAN,P.C.;          9729319901;          16 Feb 09  0:11PM;Job 604;Page 3/3

Mr. Irvin Grodsky
February 16, 2009
Page 2

retained by Mr. Freeman.

The fact that Mr. McAuley may have allowed access to the Joint Venture property after Mr. Freeman's execution of the Assignment as an act of kindness to his cousin, does not restrict the successor owners of such Joint Venture Interest from exercising their rights related thereto.

Very truly yours,

GEARY, PORTER & DONOVAN,
A Professional Corporation

By: _____
      Jeffrey L. Fisher

Sent By: GEARY PORTER&DONOVAN,P.C.;        9729319901;        16 Feb 09  0.10PM;Job 604;Page 1/3



**GEARY, PORTER & DONOVAN**
A PROFESSIONAL CORPORATION

ATTORNEYS AND COUNSELORS

ONE BENT TREE TOWER
16475 DALLAS PARKWAY, SUITE 400
ADDISON, TEXAS 75001-6837

POST OFFICE BOX 700248
DALLAS, TEXAS 75370-0248
(972) 931-9901
FACSIMILE (972) 931-9208

## FACSIMILE COVER LETTER

**FROM:** Jeff Fisher

**DATE:** February 16, 2009

**SENDER'S DIRECT DIAL NO.:** 201

**NUMBER OF PAGES (INCLUDING COVER):** 3

**CLIENT/MATTER NO.:** 14655-50191

### PLEASE DELIVER THE FOLLOWING PAGES TO:

| Name: | Company | Facsimile No.: |
|---|---|---|
| 1. Mr. Irvin Grodsky | Irvin Grodsky, P.C. | 251-433-3670 |
| 2. | | |
| 3. | | |
| 4. | | |

#### SPECIAL INSTRUCTIONS

---

### CONFIDENTIALITY NOTICE

The documents accompanying this facsimile transmission may contain confidential information which is legally privileged. The information is intended only for the use of the recipient named above. If you have received this facsimile in error, please immediately notify us by telephone to arrange for return of the original documents to us, and you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this facsimile information is strictly prohibited.

If you do not receive all pages, please call Cindy Buckner at (972) 349-2265 ASAP.

Thank you.

**IRVIN GRODSKY, P.C.**
ATTORNEYS AT LAW
454 DAUPHIN STREET
MOBILE, ALABAMA 36602
(251) 433-3657

IRVIN GRODSKY
TERRIE S. OWENS

August 28, 2009

MAILING ADDRESS:
P.O. BOX 3123
MOBILE, ALABAMA 36652
FAX (251) 433-3670

Jeffrey L. Fisher
Attorney at Law
Geary, Porter & Donovan
Post Office Box 700248
Dallas, Texas 75370-0248

     Re:    David B. Freeman, III

Dear Mr. Fisher:

    It has been several months since I received your response to my request in behalf of David Freeman seeking the recognition by all joint venturers of Mr. Freeman's interest in the Perdido Key Joint Venture. During this period of time, Mr. Freeman has been denied use of the Unit for the weeks that traditionally have been allotted to him. As noted previously, Mr. Freeman acknowledges an indebtedness to the estate of Michael McAuley which was secured by the assignment of his interest in the joint venture. He is agreeable to paying the amount of that indebtedness upon confirmation that the estate or the Marital Trust, whichever is applicable, will advise the governing body of the joint venture that he owns and is entitled to enjoy the joint venture interest for which he contributed his time and expertise to obtain.

    While your letter states that the Assignment contains no language limiting the effect of the Assignment to an assignment for security, your letter fails to explain why Mr. McAuley, after receipt of the Assignment in 1999 and during his lifetime, never stated that the Assignment was to be an absolute assignment and, to the contrary, stated that it was to be held only until Mr. Freeman paid back the loaned amount, why Mr. McAuley, after receipt of the Assignment and during his lifetime, not only directed that Mr. Freeman have the use of the Unit in accordance with the normal schedule for usage by each member, but also encouraged Mr. Freeman to expend time and effort in protecting, maintaining, and improving the Unit, and why, even after Mr. McAuley's death, his wife, for two years, never sought to interfere with Mr. Freeman's ownership rights. It is my understanding that for a period of years no one ever expressed the position that the Assignment was intended to be absolute until the Bank became the Trustee and somehow received possession of the Assignment document.

    This problem needs resolution without the necessity of a legal proceeding. Please advise if the estate or Marital Trust will accept payment of the full amount plus interest in exchange for the cancellation of the Assignment and the recognition by the Joint Venture of Mr. Freeman's ownership rights.

EXHIBIT
F

Jeffrey L. Fisher
August 28, 2009
Page 2

_____

Thank you and I look forward to hearing from you.

Very truly yours,

Irvin Grodsky

IG:ljt
File 3355
cc:     David B. Freeman, III

 Frost

8201 Preston Road
Dallas, Texas 75225

Mary A. Coane, CTFA
VP & Trust Admin.
Frost Financial Management Grp.
Tel: 214.515.4953
Fax: 214.515.4939

September 14, 2009

Mr. Irvin Grodsky, P.C.
454 Dauphin Street
Mobile, AL 36602

     RE:   Perdido Key

Dear Mr. Grodsky:

We are in receipt of your letter dated August 28, 2009 addressed to Jeffrey Fisher of Geary, Porter & Donovan. Becky McAuley has asked us to respond to this letter as Trustee of the Marital Trust, which as you know owns 40% of MFM Perdido Key LLC.

We are in possession of the original Assignment executed by David B. Freeman, III and Michael F. McAuley on January 31, 1990. As Mr. Fisher indicated in his correspondence of February 16, 2009, there is no provision in the Assignment that any rights were intended to be retained by Mr. Freeman. If you have any written documentation that would question the validity of the Assignment, please forward the information to my attention at your earliest convenience.

Based upon the limited information we have, we cannot consider accepting full payment plus interest in exchange for the cancellation of the Assignment.

Should you have any questions, please feel free to contact me at 214.515.4953. Thank you.

Sincerely,

Mary Coane

cc: Hardie Herman, SVP & Manager
    Becky McAuley

RECEIVED SEP 1 8 2009



EXHIBIT
G

A subsidiary of Cullen / Frost Bankers, Inc. NYSE Symbol: CFR.

# BEGGS & LANE

RUSSELL A. BADDERS
MARY JANE BASS
ELIZABETH C. CALLAHAN
JAMES S. CAMPBELL
JODI DANIEL COOKE
J. NIXON DANIEL III
JOHN P. DANIEL
TERRIE L. DIDIER
W. LEE ELEBASH
THOMAS F. GONZALEZ
STEVEN R. GRIFFIN
BRET M. KANIS
GARY B. LEIGHTMAN
JACK W. LURTON III
DAVID L. McGEE
GREGORY R. MILLER
WILLIAM H. MITCHEM
RALPH A. PETERSON
JEFFREY A. STONE
DAVID B. TAYLOR III
RUSSELL F. VAN SICKLE
MATTHEW D. VINSON
JAMES M. WEBER
CHARLES T. WIGGINS
JOHN F. WINDHAM
JOHN R. ZOESCH III

A REGISTERED LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AND COUNSELLORS AT LAW
POST OFFICE BOX 12950
PENSACOLA, FLORIDA 32591-2950

501 COMMENDENCIA STREET
PENSACOLA, FLORIDA 32502-5953
TELEPHONE (850) 432-2451
TELECOPIER (850) 469-3331

W. SPENCER MITCHEM
OF COUNSEL

E. DIXIE BEGGS
1908 - 2001

BERT H. LANE
1917 - 1981

August 17, 2011



## VIA FIRST CLASS U.S. MAIL
Jeffrey L. Fisher, Esq.
Geary, Porter & Donovan
P.O. Box 700248
Dallas, TX 75370-0248

Re:   David B. Freeman v. Frost National Bank, Trustee for the McAuley Marital Trust

Dear Sir,

Our firm now represents David B. Freeman ("Freeman") with regard to the above-referenced matter. Please direct all future correspondence and/or notice to Freeman concerning the matter to my attention at the address listed above.

We have reviewed the Second Revised Joint Venture Agreement of Perdido Key Joint Venture ("Agreement") and the Assignment of Joint Venture Interest ("Assignment"). We have also reviewed the 2009 correspondence between yourselves and Mr. Irvin Grodsky, the Freemans' previous attorney, regarding the same. Contrary to your assertions therein, the Assignment was not an effective transfer of Freeman's interest in the Perdido Key Joint Venture ("Joint Venture") to Mike McAuley ("McAuley"), nor was it intended to be. For the reasons set forth below, Frost National Bank ("Frost"), in the name of the McAuley Marital Trust ("Trust"), has wrongfully interfered with Freeman's use and enjoyment of his interest in the Joint Venture since January 2009.

The Agreement clearly states that "the interest of a Venturer in the Joint Venture <u>may not be assigned</u>, sold, transferred, hypothecated or otherwise disposed of <u>without the prior written consent of sixty percent (60%) in interest of the Venturers</u>." *See* Art. VII, § 7.1(a) (emphasis added). The parties thereto obviously understood this requirement, as section (d) expressly acknowledges the Venturers' approval of an assignment by Freeman of 25% of his interest in the Joint Venture to one Robert Griffin. *See* Art. VII, § 7.1(d). No such written consent was sought or given by the members of the Joint Venture prior to execution of the Assignment (none of them even knew Freeman was pledging his ownership interest as security for the debt, as this was a personal matter between cousins Freeman and McAuley). Thus, the purported "transfer" of Freeman's interest was ineffective as a matter of law. *See Rafkind v. Simon*, 402 So.2d 22, 23 (Fla. 3d DCA 1981)("A partner may not assign his interest in a partnership without obtaining consent of the remaining partners where the joint venture agreement prohibits such an assignment without consent."); *Rodgers v. RAB Investments, Ltd.*, 816 S.W.2d 543, 547 (Tex. App. Dallas 1991) (citing *Rafkind v. Simon*).

Jeffrey L. Fisher, Esq.
August 17, 2011
Page 2

Furthermore, even if the Assignment was valid without the prior written consent required in the Agreement, the facts of this case fit squarely within the doctrine of reformation based on mutual mistake. *See Providence Square Association, Inc. v. Biancardi*, 507 So.2d 1366, 1369-1372 (Fla. 1987); *USAA Cas. Ins. Co. v. Threadgill*, 729 So.2d 476, 478 (Fla. 4th DCA 1999). The Assignment, as written, does not accurately reflect the true intention and agreement between Freeman and McAuley. The parties agreed to a collateral assignment, not a full transfer of Freeman's interest, and due to some unknown error or inadvertence, something different is expressed in the Assignment. Freeman is entitled to reformation of the Assignment so that it accurately reflects the true terms of the agreement actually reached.

At the very least, Freeman and his wife, Alice Freeman, are entitled to equitable relief as a result of Frost's actions. Frost should be equitably estopped from enforcing the Assignment according to its actual terms due to McAuley's misrepresentation of the nature of the Assignment and Freeman's detrimental reliance thereon, including but not limited to the endless hours and effort dedicated to maintaining and remodeling the condo unit over the last 20 years after various hurricanes blew through. If McAuley, as predecessor in interest to the Trust, intended the Assignment to be a true assignment, he was unjustly enriched by the benefits conferred upon him by the Freemans under the mistaken belief that they were part-owners of the condo unit.

Freeman acknowledges and has offered to pay, in previous correspondence, the debt reflected in the Assignment. He is also willing to pay reasonable interest thereon, subject to set-off of the value of the denied use and enjoyment of his Joint Venture interest for the past three (3) years. If Frost is unwilling to renounce its claim on Freeman's interest in the Joint Venture under such terms, the Freemans will pursue the legal remedies available to them. Let me hear from you within ten (10) days of the date of this correspondence if Frost wishes to accept Freeman's offer of settlement.

Please govern yourself accordingly, for you shall receive no further notice.

Sincerely,

J. Nixon Daniel, III
For the Firm

cc:   Mr. and Mrs. David B. Freeman
      Perdido Key Joint Venture, c/o J. Patrick Duffy (Managing Venturer)

BEGGS & LANE

A REGISTERED LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AND COUNSELLORS AT LAW
POST OFFICE BOX 12950
PENSACOLA, FLORIDA 32591

To:

Comercia Bank & Trust
100 Renaissance Center
Detroit, MI 48226